[Crim. No. 9299. In Bank. June 10, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. EDMUND
EARL REEVES, Defendant and Appellant.

Mary Montgomery, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Raymond M. Momboisse and Theodore T. N. Slocum, Deputy Attorneys General, for Plaintiff and Respondent.

MOSK, J.—This is an automatic appeal (Pen. Code, § 1239, subd. (b)) from a judgment imposing the death penalty upon conviction of murder in the first degree.[1]

Defendant relies primarily upon asserted inadequacy of the representation provided by his trial counsel, but we conclude that this and the other contentions of defendant are without merit and that the judgment must be affirmed.

When the record is viewed in the light most favorable to the judgment, as it must be, the following facts appear: on the morning of March 24, 1965, two employees of the Standard Oil Company, Floyd Parsons and Paul Pugh, drove to an oilfield outside Bakersfield for the purpose of checking its operation. As they arrived, defendant was observed emptying the contents of a 5-gallon can into a container in the trunk of his car, parked next to a toolhouse. The men at first ignored defendant and conducted their own business. Pugh then heard someone walk up behind him and order him to turn around and put up his hands. He did so and found himself looking into a gun held by defendant, and nearby was Parsons with his hands up. Defendant instructed the men to

---

[1]Defendant was also convicted of robbery in the second degree, but the court imposed no sentence on that count.

"unload your pockets and throw it on the ground." Pugh threw down a total of some $150, but Parsons had only 70 cents. Defendant then said brusquely, "All right, turn around and start walking." They obeyed, and as they walked slowly between two tanks Parsons veered to the left and Pugh to the right. Defendant called out, "No, go the other way, the other way," gesturing with his gun for Pugh to remain with Parsons.

The men continued walking slowly together. Their path narrowed as they reached some pipes supporting a catwalk, and Parsons' arm touched Pugh. At that point both men were hidden from the road and the adjacent workyard. As they passed the pipes with their backs to defendant, he began firing steadily and "not too fast." Parsons lurched heavily against Pugh, who jumped around a tank and ran a weaving course until he was behind a boiler. After the shots ceased, Pugh came out onto the road. Defendant saw him and fired twice more, but Pugh took cover in a clump of brush. Pugh watched as defendant returned to the robbery loot, picked it up and pocketed it, then ran to his car and drove away at high speed. Pugh found Parsons' body and called the police. Defendant was identified by Pugh from a photograph, and was arrested two days later in Los Angeles.

The testimony of a pathologist established that Parsons died from injuries caused by a bullet fired from the right rear, passing through his arm and back and exiting from his chest. Although this wound was fatal, Parsons had been shot twice more, once in the abdomen and once in the chest.

On this evidence defendant was indicted on April 1, 1965, on one count of murder and one count of robbery. On April 2 the trial court appointed James Meeks as counsel for defendant. After several continuances defendant was arraigned on May 5 and entered the sole plea of not guilty by reason of insanity to both counts. Three doctors were appointed to examine defendant and determine the question of his sanity. On May 27 defendant waived trial by jury on the sanity issue and stipulated that the matter be submitted to the court on the basis of the doctors' reports. The court found, in accordance with the unanimous medical opinions expressed in those reports, that defendant was sane at the time of committing the crimes and was sane for the purpose of standing trial.

Defendant at first requested a court trial on the issue of the degree of the murder, but on June 11, the date set for the hearing, defendant stipulated that the murder was of the first degree by reason of the felony-murder rule. Defendant

also waived a jury on the penalty issue, stipulating that the matter be determined by the court on the basis of the grand jury transcript, defendant's "rap sheet" or record of arrests and dispositions, and oral argument. The court continued the proceedings to June 23 to enable it to study the documents in question, and on the latter date heard argument and took the matter under submission. On June 30 the court entered a judgment imposing the death penalty on the murder count.

██ Defendant's sole plea of not guilty by reason of insanity, of course, "admits the commission of the offense charged." (Pen. Code, § 1016.) When the insanity defense failed and the court as trier of fact determined that the death penalty should be imposed, defendant was left with few issues on appeal other than the asserted inadequacy of the representation provided by his trial counsel.

██ At the threshold, defendant challenges the very order appointing Mr. Meeks to serve as his attorney, arguing that it "denied him his right to counsel of his own choosing." The basis of this attack is a reporter's clerical error in recording as an affirmative defendant's negative answer to the court's query, at arraignment, as to whether he had funds to hire his own attorney. Some weeks after entry of judgment the court on motion of the district attorney made an order correcting the transcript to show a negative answer. Notice of the motion to correct had been served on defendant only four days earlier, at a time when defendant had discharged his trial counsel and was incarcerated on Death Row; when the hearing was held defendant was therefore neither present nor represented by counsel. In view of the potential importance of this point to defendant's appeal we returned the record to the trial court with directions to resettle the disputed portion of the transcript in a proceeding at which defendant would have the right to appear either in propria persona or by counsel. (Cf. *Chessman* v. *Teets* (1957) 354 U.S. 156 [77 S.Ct. 1127, 1 L.Ed.2d 1253]; *In re Finn* (1960) 54 Cal.2d 807, 814-815 [8 Cal.Rptr. 741, 356 P.2d 685].) A hearing for that purpose was duly held, and witnesses testified both for and against the proposed correction; among others. defendant testified in his own behalf. The court made an order again correcting the transcript to show a negative answer by defendant to the question whether he had funds to hire his own attorney.

The settlement of a transcript is primarily a question of fact to be resolved by the trial court (*People* v. *Mitchell*

(1964) 61 Cal.2d 353, 371 [38 Cal.Rptr. 726, 392 P.2d 526]), and no abuse of the court's discretion in this respect is shown here.

As indicated above, defendant now contends on appeal that his trial counsel reduced the proceedings to "a farce or a sham" by offering or entering into various waivers and stipulations, and that the court committed prejudicial error by accepting such waivers and stipulations assertedly in the absence of a showing that defendant "intelligently understood" their import and possible consequences. For the same reason, defendant also asserts it was prejudicial error for the court to accept his sole plea of not guilty by reason of insanity.

To begin with the last mentioned argument, it is noteworthy that more than a month elapsed between the appointment of trial counsel and the date of arraignment and plea. The record shows that counsel conferred with defendant during this period, and there is therefore no basis for an inference that counsel was inadequately prepared to enter the plea. (Cf. *People* v. *Avilez* (1948) 86 Cal.App.2d 289, 294-295 [194 P.2d 829], and cases cited.) The record of the arraignment further indicates that defendant had been advised by his counsel and understood that in the event he was found sane his plea of not guilty by reason of insanity would become in effect a plea of guilty (Pen. Code, § 1026), that his rights had been "fully explained" to him, and that he understood "the nature of this plea."[2] Although the words of the plea were spoken by defense counsel, the trial judge questioned defendant personally in open court and defendant voiced his concurrence therein. This is sufficient compliance with the requirement of Penal Code section 1018 that "every plea must be put in by the defendant himself in open court." (*In re Martinez* (1959) 52 Cal.2d 808, 815 [345 P.2d 449]; *People* v. *Martin* (1964) 230 Cal.App.2d 62, 63 [40 Cal. Rptr. 700]; *People* v. *Gibbs* (1961) 188 Cal.App.2d 596, 600-601 [10 Cal.Rptr. 581].) No error appears in the court's acceptance of the plea under these circumstances.

The decision of defendant's trial counsel to enter into various waivers and stipulations reflects neither incompetence

---

[2]After the reading of the indictment defense counsel responded:

"MR. MEEKS: To all of which the defendant, Mr. Reeves, enters a plea of not guilty by reason of insanity.

"THE COURT: You enter that plea as to both counts?

"MR. MEEKS: As to both counts. For the record, if the Court please, I have explained to Mr. Reeves that the Court will appoint psychiatrists

nor lack of diligence. In the face of strong prosecution evidence in the form of the surviving eyewitness' testimony that defendant without provocation shot down from behind a robbery victim from whom he had taken a mere 70 cents, it was not unreasonable for defendant and his counsel to choose, as they inferably did, to admit the facts and throw defendant on the mercy of the court.[3] The fact that the strategy was unsuccessful on this occasion, of course, is no ground for concluding that the counsel who conceived it was incompetent. (*People* v. *Robillard* (1960) 55 Cal.2d 88, 96 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086].)

A common feature of the strategy of seeking mercy is for counsel to emphasize the defendant's contrition and his willingness to cooperate, by offering and entering into such waivers and stipulations as will expedite the disposition of the case. Each waiver and stipulation now complained of by defendant was of this kind. ■ For example, it was proper for counsel to waive the formal advising of defendant of his rights under the insanity plea, after defendant had just acknowledged in open court that such rights had been "fully explained" to him and that he understood them (*ante*, fn. 2). ■ It was also within counsel's discretion to offer to stipulate that the sanity issue be submitted on the basis of the medical reports (*People* v. *Dessauer* (1952) 38 Cal.2d 547, 552 [241 P.2d 238]), and, in view of the undisputed evidence showing the

---

to examine him and if the findings of the psychiatrists is [*sic*] that he is sane at the time of the commission of the offenses and also presently that a plea of guilty automatically comes into being. Is that a correct statement?

"THE DEFENDANT: It is.

"MR. MEEKS: And you understand that?

"THE COURT: Mr. Meeks has fully explained your rights in this case, is that true?

"THE DEFENDANT: Yes.

"THE COURT: And you understand the nature of this plea as Mr. Meeks has just entered it in your behalf?

"THE DEFENDANT: Yes.

"THE COURT: And you concur with that plea?

"THE DEFENDANT: Yes."

[3]That this was defendant's strategy is indicated by the following arguments addressed by his counsel to the court: "I want to say in behalf of this man, Reeves, that at all stages of these proceedings, he has been most cooperative and in fact, almost to the degree of being anxious to see why this thing came about. . . . I realize the transaction as such is not a very pleasant situation, we have not made any effort to lessen this thing. The man stands ready and has thrown himself on the mercy of the court to pay the penalty, to adjust to society, in the commission of this offense, we have admitted openly and voluntarily, and as I say, Mr. Reeves has cooperated at all stages of the proceeding and he knows he has done the wrong thing . . . ."

killing to have occurred in the perpetration of a robbery, to offer to stipulate that the murder was of the first degree by operation of law (Pen. Code, § 189). Again, counsel could properly offer to stipulate, with defendant's concurrence, that the penalty issue be determined on the basis of the grand jury transcript, defendant's rap sheet, and oral argument. (Cf. *People* v. *Wallin* (1950) 34 Cal.2d 777, 780-782 [215 P.2d 1]; *People* v. *Andrews* (1965) 234 Cal.App.2d 69, 77-79 [44 Cal.Rptr. 94], and cases cited.)

 To justify relief on the ground of constitutionally inadequate representation of counsel, " 'an extreme case must be disclosed' [Citations]. It must appear that counsel's lack of diligence or competence reduced the trial to a 'farce or a sham.' [Citations.]" (*People* v. *Ibarra* (1963) 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487].) Defendant has the burden, moreover, of establishing his allegation of inadequate representation "not as a matter of speculation but as a demonstrable reality." (*Adams* v. *United States* ex rel. *McCann* (1942) 317 U.S. 269, 281 [63 S.Ct. 236, 87 L.Ed. 268, 143 A.L.R. 435]; accord, *People* v. *Robillard* (1960) *supra*, 55 Cal.2d 88, 97.)

 Here defendant has failed to sustain that burden. There is no showing, for example, of an "unawareness of a rule of law basic to the case . . . that reasonable preparation would have revealed." (*People* v. *Ibarra* (1963) *supra*, 60 Cal.2d 460, 466.) Rather, the record discloses that Mr. Meeks was well aware of the tactical moves commonly made by counsel in the presence of strong inculpatory evidence against their clients, in the often fulfilled hope of impressing the trier of fact with their clients' candor, remorse, and willingness to cooperate. Defendant expressly concurred in every step thus taken, and he cannot now be heard to complain of the course followed merely because it proved unrewarding. Applicable here, by analogy, is the general rule that "the right to counsel may not be used to subvert the orderly and efficient administration of justice." (*People* v. *Douglas* (1964) 61 Cal.2d 430, 435 [38 Cal.Rptr. 884, 392 P.2d 964], and cases cited.)

 As just mentioned, defendant expressly concurred in every waiver and stipulation here challenged. We have already seen (*ante*, fn. 2) how the record reflects defendant's informed and understanding concurrence in entering the sole plea of not guilty by reason of insanity. Similarly, the record shows that on the occasions of each waiver and stipulation defendant

was asked by his attorney, and frequently also by the court, whether he understood and consented to that step; in each instance, he replied in the affirmative.[4] Such a record establishes that the trial court fulfilled its obligation to protect defendant's substantial rights, and did not err in accepting the waivers and stipulations to which he consented in open court.

Defendant maintains that his repeated acceptances of his counsel's offers to stipulate should not be accepted at face value because he was assertedly "overawed by the formality of a Superior Court, intimidated by the solemnity and possible consequences of the charged offense." The backdrop of this case makes the argument utterly unconvincing. We are not dealing here with a timorous youth involved in aberrant conduct and caught in the clutches of the law for the first time in his life; rather, as the trial court observed at the time of sentence, this defendant "spent almost the entire last 14 years of his 27 year life span in penal institutions under the supervision of youth and adult authorities." Prior to the present proceedings defendant had made many court appearances, on charges such as car theft, escape, burglary, armed robbery, and assault with a deadly weapon committed while in prison. It is difficult to believe that a recidivist possessing vast experience with serious criminal charges and the judicial procedures in connection therewith would be "overawed" or "intimidated" by yet one more appearance in court.

 Defendant next contends that it was prejudicial error for the court to consider on the penalty issue the portion of his rap sheet relating to proceedings in juvenile court. The point is without merit. Defendant expressly consented in open court to the introduction and consideration of the entire rap sheet, and in any event we have held juvenile court records to be admissible for this purpose (see *People* v. *Terry*

---

[4]Typical in this respect is the following colloquy:

"MR. MEEKS: Is it your desire, Mr. Reeves, to have a Court trial rather than a jury trial both on degree and sentence?

"THE DEFENDANT: Court trial.

"THE COURT: Do you waive the jury, Mr. Reeves?

"THE DEFENDANT: Yes.

"THE COURT: You understand you are entitled to a jury trial on both issues?

"THE DEFENDANT: Yes.

"THE COURT: And knowing that, you wish to waive the jury and have the evidence heard and a determination made by the court sitting without a jury, is that correct?

"THE DEFENDANT: Yes, sir.

"THE COURT: Mr. Meeks, you concur with the waiver?

"MR. MEEKS: I will concur with the waiver . . . ."

(1964) 61 Cal.2d 137, 144, fn. 3 [37 Cal.Rptr. 605, 390 P.2d 381]).

Defendant contends that the district attorney made certain improper remarks in arguing the penalty issue. Reference is to the prosecutor's comment that defendant's "background and history alone" show he is not rehabilitatable, and to the prosecutor's remark that "I don't believe" defendant has demonstrated he can be trusted in society. At the time these remarks were made, however, defendant neither objected nor requested the court to ignore the comment; and as neither remark "contributed to the verdict or was so unredeemable that nothing whatever would have cured it" (*People* v. *Rosoto* (1962) 58 Cal.2d 304, 357 [23 Cal.Rptr. 779, 373 P.2d 867]), defendant is deemed to have waived any objections thereto and may not raise the matter on appeal. In appraising the effect of the remarks, moreover, we take into consideration the fact that they were made not to a jury but to the court alone. (*People* v. *Welch* (1962) 58 Cal.2d 271, 274 [23 Cal. Rptr. 363, 373 P.2d 427].)[5]

Defendant contends that he was improperly induced by his trial counsel and the court to forego a plea of not guilty through representations that a sentence of life imprisonment would be imposed. The claim is without factual support in the record. As the sole basis for his assertion that Mr. Meeks assured him he would receive a life sentence, defendant relies on his own affidavit appended to the opening brief on appeal. This affidavit, however, was not presented to the trial court, and hence is "not a proper part of the record" (*People* v. *Arguello* (1964) 61 Cal.2d 210, 213 [37 Cal.Rptr. 601, 390 P.2d 377]; *People* v. *Agnew* (1940) 16 Cal.2d 655, 660 [107 P.2d 601]; *People* v. *Croft* (1955) 134 Cal.App.2d 800, 804 [286 P.2d 479]).

Moreover, even if we were to consider defendant's affidavit and give it full credence, a case for relief under the circumstances is still lacking. As defendant recognizes, purported misrepresentations by defense counsel that a specific sentence will be imposed are insufficient to vitiate a plea entered in reliance thereon; there must also be apparent substantial corroboration of or connivance in such misrepresentations by a responsible public officer, relied on in good faith

---

[5]Defendant also claims, without specifying any particular statement, that in reviewing the rap sheet for the court the district attorney did not state the facts accurately. No objection was voiced at that time, however; and we must assume that the court, which had a copy of the rap sheet before it, was not misled by any possible misstatement on the part of the district attorney.

by the defendant, and the misrepresentations must actually operate to preclude the exercise of the defendant's free will and judgment. (*People* v. *Gilbert* (1944) 25 Cal.2d 422, 443 [154 P.2d 657].)

 The only claimed corroboration defendant is able to point to is "Judge Steele's manner in court and certain statements he made regarding consecutive sentences." We may disregard the cryptic reference to the trial judge's "manner in court," as it is not further explained by defendant and does not appear on the face of the record. The judge's "statements regarding consecutive sentences" were simply brief questions addressed to counsel, inquiring whether the prohibition against double punishment (Pen. Code, § 654) would be applicable to this case; any inference that such remarks represented a commitment to forego consideration of the death penalty must have been dispelled later in the same hearing, when the judge also inquired as to the procedure for fixing a time for execution "in the event that I decide to impose the death penalty." But regardless of speculation as to the judge's meaning, the bare chronology of events rules out defendant's claim. Defendant entered his sole plea of not guilty by reason of insanity on May 5, 1965; obviously, to be relevant here any official corroboration of his counsel's representations must have influenced defendant at that time or not at all. The judge's mention of consecutive sentences was not made until the penalty hearing, some seven weeks after entry of plea, and hence cannot be relied on by defendant for the purpose now asserted.

 Defendant's final contention is that the evidence is insufficient to support the conviction of first degree murder and the imposition of the death penalty. In view of the undisputed evidence that this was an unprovoked killing in the perpetration of a robbery, together with what amounts to a plea of guilty by defendant. the first phase of the contention cannot be sustained. As to the imposition of the death penalty, "We have held repeatedly that the trier of fact has sole responsibility to select the penalty for first degree murder and that this court cannot substitute its judgment as to the choice of punishment. [Citation.]" (*People* v. *Welch* (1962) *supra*, 58 Cal.2d 271, 275.)

The judgment is affirmed.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Peek, J., and Burke, J., concurred.