257 Cal.App.2d 513 (1967)
THE PEOPLE, Plaintiff and Respondent,
v.
RODNEY KEITH WELBORN, Defendant and Appellant.
Crim. No. 12508. 
California Court of Appeals. Second Dist., Div. Three. 
Dec. 27, 1967.
 Donald E. Smallwood, under appointment by the Court of Appeal, for Defendant and Appellant.
 Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Richard H. Cooper, Deputy Attorney General, for Plaintiff and Respondent.
 MOSS, J.
 Defendant pleaded not guilty and not guilty by reason of insanity to a charge of the murder of Rick Rebbe. The court appointed three psychiatrists, Drs. Crahan, Drury and Walters, to examine the defendant as to his sanity pursuant to section 1027 of the Penal Code. By stipulation, in which defendant personally joined, the guilt issue was submitted to the court upon the transcript of the preliminary hearing and of a conversation between defendant and the investigating officer. Both sides waived argument. The court found defendant guilty of murder of the first degree. By stipulation, in which defendant personally joined, the sanity issue was submitted for decision by the court upon the reports of five psychiatrists who had examined defendant. The court found that defendant was sane at the time of the homicide and at all times during the trial, and sentenced defendant to life imprisonment. Defendant made a motion for new trial which his counsel submitted without argument. The motion was denied. Defendant appealed and we appointed counsel at his request. We granted defendant's motion to augment the record to include the reports of the five psychiatrists who examined defendant and the transcript of defendant's statement to the investigating officer.
 [1a] We have concluded that the failure of defense counsel to offer in evidence at the guilt phase of the trial psychiatric evidence that the record shows was available, while at the same time neither offering nor arguing any other defense, resulted in a total failure to present the cause of the defendant in any fundamental respect, and thereby deprived him of *516 his constitutional right to effective aid of counsel. We therefore reverse the judgment.
 On Saturday afternoon, November 20, 1965, defendant and the victim, Richard Rebbe, went hunting. Rebbe failed to return and on Monday, November 22, 1965, at 3:30 p.m. the police called at the home where defendant resided with his parents and asked him if he knew where Rebbe was. Defendant stepped out of the doorway and said, "Well, he is dead." The police then advised defendant of his constitutional rights and asked him if he understood them. Defendant said he understood and that he was going to turn himself in and would have told the police officers earlier but that his family was present. Defendant then told the officers how he had shot Rebbe while they were hunting together in the Angeles National Forest. He then gave the officers the pistol he had used to fire the first shot and directed the officers to the places where he had thrown the victim's rifle and where he had left the victim's body.
 The same night, November 22, 1965, at 10:30 p.m. the police again questioned the defendant. At 1:08 a.m. the defendant made a statement which was transcribed and by stipulation received in evidence.
 Defendant told the officers that early in the outing he had accidentally fired a shot very close to Rebbe's arm. He told them that after he and Rebbe had been hunting for about one hour they had had an argument because defendant wanted to go home and Rebbe wanted to stay on. Defendant's account of what happened after the argument with Rebbe was as follows: "Q. Was this argument just a slight one or violent? A. Just--no--friends, he was more or less stubborn and I accepted it. As he got me kind of careless and I thought he was off shooting someplace else and I was kind of daydreaming. I turned sideways towards him, I guess, and I was facing in the other direction and aiming the gun just like we were shooting at trees and things, like that, and I had the gun--I had my arm out in a rigid position and as I pulled the trigger he was standing behind me or beside me with his back toward me and I hit him one time before I turned around and I fired it two or more times before I could realize what was happening." Rebbe was limp on the ground after being shot. "Q. Then what happened? A. His breathing was kind of heavy, then and he was unconscious. I felt like--like I was going to faint or something and I wandered about for a few minutes, I guess, and I didn't know what to do. I picked him up and I *517 drug him or actually carried him about 20 yards over underneath a bush that was sort of like a tree protruding out of the side of the hill there. And I was--I left him there for a few minutes, I guess, and didn't know what to do. And I picked up the rifle and aimed it at his head and I turned my head and I fired it and it struck him in the head either in the forehead or in the top of his head, I don't know. ... Q. Rodney, can you tell us, give us any reason why you shot and killed Richard Rebbe? A. No. Q. You cannot? A. Carelessness. Just clowning around."
 A medical expert testified that both the first shot fired from defendant's pistol and the second shot fired from the victim's rifle a few minutes later could have been fatal.
 When the trial commenced the psychiatric reports of Drs. Crahan, Drury and Walters were on file with the court. The psychiatrists were not called to testify. Their reports were not admissible in evidence except upon stipulation. No such stipulation was presented at the guilt phase, and there is no indication in the record that the trial judge had read or considered them at the time he found defendant guilty of murder of the first degree. The sanity phase of the trial was by stipulation submitted to the court upon the foregoing reports and in addition upon the reports of Drs. Thompson and Nielsen. Drs. Drury, Nielsen and Thompson concluded that defendant was insane at the time he shot Rebbe. Dr. Crahan, although concluding that defendant was sane, also concluded that defendant was mentally disturbed. Of the five psychiatrists, only Dr. Walters did not conclude that defendant was mentally ill to some degree. We summarize the psychiatric reports in the footnote to show the evidence bearing on the issues of premeditation, deliberation and malice aforethought which the record indicates was available to defense counsel at the trial and at the time of the motion for new trial. [fn. 1] *518
 [2] "It is counsel's duty to investigate carefully all defenses of fact and law that may be available to the defendant, and if his failure to do so results in withdrawing a crucial *519 defense from the case, the defendant has not had the assistance to which he is entitled." (People v. Ibarra, 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487].) [3] Where *520 the defense of diminished capacity is " 'withheld not through faulty judgment, but in default of knowledge that reasonable inquiry would have produced, and hence in default of any judgment at all' " the omission may constitute " 'a total failure to present the cause of the accused in any fundamental respect' " and will result in a denial of the fair trial contemplated by the due process clause. (People v. Ibarra, supra, pp. 460, 465, quoting from Brubaker v. Dickson (9th *521 Cir. 1962) 310 F.2d 30, 38-39.) [4] "To justify relief on the ground of constitutionally inadequate representation of counsel, " 'an extreme case must be disclosed' " [Citations]. It must appear that counsel's lack of diligence or competence reduced the trial to a 'farce or sham.' [Citations]" (People v. Ibarra (1963) 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487.) Defendant has the burden, moreover, of establishing his allegation of inadequate representation 'not as a matter of speculation but as a demonstrable reality.' " [Citations] (People v. Reeves, 64 Cal.2d 766, 774 [51 Cal.Rptr. 691, 415 P.2d 35].)"
 [5] At the time this case was tried on March 29 and 30, 1966, the law was well settled that evidence that the defendant in a criminal proceeding had a mental disorder can be used to show that he did not have a specific mental state essential to the commission of an offense. (People v. Wells, 33 Cal.2d 330 [202 P.2d 53]; People v. Gorshen, 51 Cal.2d 716 [336 P.2d 492]; People v. Henderson, 60 Cal.2d 482 [35 Cal.Rptr. 77, 386 P.2d 677]; People v. Wolff, 61 Cal.2d 795 [40 Cal.Rptr. 271, 394 P.2d 959].) An attorney who undertakes the defense of a murder charge should be aware of the relevance and usefulness of such evidence. The admissibility of evidence of an abnormal mental condition short of insanity to negative the element of premeditation and malice aforethought was established in People v. Wells, supra, 33 Cal.2d 330, 350, in 1949. Discussion of the use of such evidence may readily be found in standard reference works. (1 Witkin, Cal. Crimes, 300, 321, pp. 274, 292; 18 Cal.Jur.2d, Evidence, 76, pp. 503, 504; McKinney, New Cal. Dig., Criminal Law, 403(2); West's Cal. Dig., Criminal Law, 474.)
 [1b] Evidence that defendant suffered from a mental disorder was crucial to his defense in this case. [fn. 2] Since there was no evidence that the homicide was committed in any of the ways specifically enumerated in Penal Code, section 189, a finding of first degree murder could only have been predicated on a finding that the killing was "wilful, deliberate and premeditated."
 The evidence presented by the prosecution did not provide a strong basis for the inference that either of the fatal shots was premeditated and deliberate. Defendant and Rebbe were apparently friends. There was no evidence of any bad feeling *522 between them before the hunting trip began. In the early part of the trip defendant fired a shot close to Rebbe's arm. Rebbe apparently believed defendant's explanation that the shot was not intended to hurt him because the two men continued to hunt together. There is little in the evidence, therefore, from which it can be inferred that defendant had deliberated about the first fatal shot before he fired it. Defendant said that he fired the second fatal shot to end Rebbe's suffering. Evidence that defendant was in a mental state of dissociation when he fired the second shot might reasonably have convinced the trier of fact that that shot also was not "deliberate." (See People v. Holt, 25 Cal.2d 59 [153 P.2d 21]; People v. Thomas, 25 Cal.2d 880 [156 P.2d 7]; People v. Bender, 27 Cal.2d 164 [163 P.2d 8].)
 Evidence of defendant's abnormal mental condition was also crucial on the issue of whether he shot Rebbe with malice aforethought. [6] The mental state encompassed by the phrase "malice aforethought" was described in People v. Conley, 64 Cal.2d 310, 322 [49 Cal.Rptr. 815, 411 P.2d 911], as follows: "An intentional act that is highly dangerous to human life, done in disregard of the actor's awareness that society requires him to conform his conduct to the law, is done with malice regardless of the fact that the actor acts without ill will toward his victim or believes that his conduct is justified. In this respect it is immaterial that he does not know that his specific conduct is unlawful, for all persons are presumed to know the law including that which prohibits causing injury or death to another. An awareness of the obligation to act within the general body of laws regulating society, however, is included in the statutory definition of implied malice in terms of an abandoned and malignant heart and in the definition of express malice as the deliberate intention unlawfully to take life."
 [1c] The psychiatric evidence which was available to defense counsel was, therefore, also relevant to the issue of whether at the time of the homicide defendant was aware of his duty to society to act within the law.
 The record in this case shows unmistakably that defense counsel's failure to raise the defense of diminished capacity [fn. 3] was the result of ignorance of the law, not trial tactics. Even *523 without defense evidence, the prosecution's case concerning defendant's mental state at the time of the shooting was open to argument. Defense counsel waived argument. The psychiatric reports available to counsel before the trial began pointed to the strong possibility of an abnormal mental condition in this case; yet defense counsel took the initiative in stipulating that the case be submitted on the transcript of the preliminary hearing without reference to the psychiatric reports. The fact that defense counsel again took the initiative in stipulating that the sanity phase of the trial be submitted on the reports of the psychiatrists indicates that counsel probably thought that the reports were relevant only to the sanity issue. After the degree of the murder had been fixed as first degree, and all of the psychiatrists' reports were in evidence, defense counsel submitted the motion for new trial without argument. There is nothing in the record to indicate that the trial judge considered or was even aware of the possible defense of diminished capacity. Therefore, the complete failure of defense counsel to produce either evidence or argument at the guilt stage of the trial and in support of the motion for new trial reduced the trial to a farce and a sham. In holding that defense counsel failed to present a crucial defense, we do not imply that the psychiatric reports or psychiatric testimony would, if received in evidence, necessarily prove that defendant did not act with malice aforethought or with the kind of premeditation and deliberation necessary for a conviction of first degree murder.
 The judgment is reversed.
 Ford, P. J., and Cobey, J., concurred.
 Dr. Crahan examined defendant on January 20, 1966. Defendant told him, "I was going on a hunting trip with a friend of mine, went over to his house on a 'cycle, told him I was pissed off at my father, and we started talking about that on the way up there. We went up in his car, left the 'cycle at his house. We were down there in a gulch and I was standing there in the clearing and he seen the look on my face. We was arguing about leaving, just a slight argument, and the next thing I know, questions were running through my mind, 'Why do I have to be a stranger?' and shit like that. 'Why in the hell does he have to treat me this way? Stinking old man.' And I didn't realize Rick was so close, and it was just an accident. I fired the damn thing and I started to black out, but as he was going down he just looked like he was an old man. He went down. I was black. I was waking up in my own bed two days later. I guess the first thing they did, after I heard my dad's voice in the living room, looked out the window to see if I had his car parked out front, and then I got the phone book, figuring maybe I had left him up there and parked the car at his place and brought my 'cycle home or something, going to phone his house. I just didn't know what to think. I wasn't thinking.police got hold of me, wound up at the Foothill Police Station talking to some sheriff's deputies there, and they pumped some kind of a statement out of me. Next day they had me taken to where the body was and there was all kinds of cameramen flashing pictures of me. I was taken from the Newhall Station to the new County Jail and I was so damn tired I didn't know where I was. Wake up in the middle of the night and Rick would be standing in that cell and I would be shook up. Standing there laughing at me. One time he was standing there with three sheriff's deputies."
 Dr. Crahan concluded, "This young man is a mentally disturbed person who is a borderline schizophrenic, but it is obvious from his admissions that he was legally sane and responsible at the time of the alleged act's alleged commission, and that he was legally responsible and sane at the time of examination."
 Dr. Drury's report:
 Dr. Drury examined defendant on January 29, 1966. The evaluation portion of his report is as follows: "General Appearance and Behavior--the defendant is a fairly tall, slightly thin, well-developed white male, appearing to be about his stated age of twenty. He is well-groomed and sits back in the chair with his head down and his hands in front of his eyes, and does not look at the examiner. Stream of Talk--relevant and goal- directed at all times. There is little spontaneous production. There is no looseness of association. Emotional Status--appears somewhat depressed throughout the examination. There is a moderate lability to his affect. He is somewhat preoccupied, occasionally, especially when talking about the crime. Abnormal mental trends. He states that at the time of the shooting, he remembers hearing a voice, not his friend's although there was no one else at the scene. He does not remember what the voice said. He apparently had some sort of illusory experience, in that he said his friend resembled his father, when he had turned and found he had shot him. Mental Grasp and Capacity--attention and comprehension are adequate in that he understands and answers his questions readily. He was oriented as to time, place and person, and seems to be of at least average intelligence. He does the 100 minus 7 tests rapidly and without any mistakes. He is able to think in an abstract way, but does not give very sophisticated interpretations to the proverbs. He does simple arithmetical calculations quickly. His memory for both remote and recent events seems to be adequate except for the period of time, immediately following the shooting. His insight and judgment are impaired."
 "The defendant does not have a sociopathic history and has apparently had some emotional disturbance necessitating his discharge from the Navy. He gives a long history of bitterness toward his father, for the way, the father has allegedly dealt with him. I feel that the defendant probably suffered a psychotic episode at the time of the shooting, during which he suffered an auditory hallucinatory experience, as well as a visual illusory one. Afterwards, he apparently had a dissociative episode, during which he took the friend's car to San Diego and returned. I do not feel, he appreciated the nature and quality of his acts or the consequences thereof. I feel he is presently able to understand the nature and purpose of the proceedings taken against him, and to conduct his own defense in a rational manner."
 Dr. Walters' report:
 Dr. Walters examined defendant on March 16, 1966. In his report, Dr. Walters stated, "As manifested by his speech there was no definitive abnormality in his thinking processes. His thoughts were pertinent, goal directed, and flowed in a realistic fashion. He was perceptive to questions, gave thoughtful and guarded answers, and showed no evidence of perseveration, inconsistencies or circumstantiality. His mood was one of controlled antagonism, hostility and defiance. He was free to express his open antagonism toward any authority and by the trend of his thoughts related this to the open antagonism which he has toward his father. Apparently, at times, this man's hostility and defiance can reach rage-like proportions. At these times, it is quite possible that he is capable of extreme impulsive behavior. It well may be that his abortive suicide gesture in the Navy as well as the offense for which he is before the court occurred under similar circumstances. It is most likely that when he shot his friend, it was not only anger and hostility directed toward his friend who would not cooperate with his wishes and whims but also a holdover from the extreme hostility which he harbored toward his father because of the argument which they had during that day. Apparently, his father told him to leave the house prior to his going off with his friend. Undoubtedly he was extremely apprehensive about the fact that his father might carry through with his threat and that he might be put in a position of caring for himself. This marked passive dependence and aggressiveness toward authority is the most remarkable thing in this young man's personality structure. He does not attempt to relate to other individuals, as manifested by this psychiatric evaluation, in any sort of a pleasant manner. This man's thinking is extremely childlike and narcissistic. He wishes to be indulged in all occasions. This examination did not reveal any evidence of hallucinatory activity or delusional material. Apparently, in his home, much of his antagonism and hostile behavior has been tolerated, and without any consequence coming to him because of it. His family has permitted him to be seclusive, unsocial and in many ways has perpetuated his dependence on them."
 Dr. Walters then concluded that defendant was sane at the time of the commission of the offense and presently able to understand the nature of the proceedings taken against him and to conduct his own defense.
 Dr. Thompson's report:
 Dr. Thompson examined defendant on February 22, 1966. Dr. Thompson discussed defendant's mental condition in part as follows: "It is the opinion of the examiner, from his examination of this defendant, that he is mentally ill, that he is psychotic, and that he suffers with the specific mental disorder of schizophrenia, paranoid type. He manifests numerous symptoms of this. He is somewhat tangential in his thinking, he shows loss of interest, apathy, as well as mental depression. He shows considerable withdrawal of the personality. He has undergone a dissociative episode and has experienced a delusional belief that his friend appeared to be his father. He has had an apparent auditory hallucination. He also has manfested and did at the time of the offense a delusion of alienation in that he felt that his mind was not under his own control. He is quite vague. * * *"
 He shows marked hostility directed toward his father. His loss of interest and attention, withdrawal from the environment, dulling of emotions are all characteristic of schizophrenia. At the time of the offense he had a severe disorder of association, namely dissociation. Symbolization was manifested by his friend, Rick, taking the appearance of his father. His emotions are stereotyped.
 The symptoms that characterize the paranoid type are the presence of a minimal amount of the general symptomatology of schizophrenia, the paranoid delusions, the hallucination, the feeling of alienation, and the emotional reaction of aggressiveness. It is the opinion of the examiner that at the time of committing the offense, he was in a psychotic episode and he suffered the auditory hallucination and the visual hallucination or illusion. The dissociative episode occurred at that time.
 It is clear that there is a marked discrepancy between his statements of his memory and the statements given by the officers in the transcript of the preliminary hearing. This is typical of a dissociative episode in which a person discusses freely the things that had occurred but later does not recall having discussed these ....
 It is the opinion of the examiner, therefore, that the defendant was mentally ill, was psychotic, and insane at the time of committing the offense.
 "It is the further opinion of the examiner that he is sane at the present time, although he remains mentally ill with schizophrenia, paranoid type."
 Dr. Nielsen's report:
 Dr. Nielsen examined defendant on April 8, 1966. Defendant told him, "He heard a voice telling him to shoot the guy. The victim was lying on the ground; he knew he was dying so he carried him 20 yards. He saw the brains coming out. He then took the victim's wallet and car keys. He started to cover him with leaves. He took the rifle and carried it from place to place. He debated whether to call the police."
 He knew he could never prove it was an accident. So he went back, did not want to leave him there alive and he shot three times and hit him once. He saw no blood so he decided he was dead. ... He said he did not think it was wrong to shoot the victim with his pistol because voices told him to do so but that it was wrong to shoot him again with the victim's own rifle. Realizing then that this was wrong, he thought of self-defense or escape. He debated whether to commit suicide or escape but decided on the latter.""
 Dr. Nielsen concluded: "The defendant is a schizophrenic. It is to be noted that he had a mental disturbance while in the Navy which caused him to attempt suicide. Also, he has heard voices on at least two occasions, one telling him to shoot the victim, at another time voices were making derogatory remarks about him while the police were questioning him."
 "The defendant was insane at the time of the commission of the crime and he is still insane. He is not capable of aiding in the conduct of his own defense in a rational manner. Inasmuch as a person with schizophrenia is never cured, treatment in any state hospital would only temporarily benefit the defendant. He definitely has criminal tendencies."
NOTES
[fn. 1] 1. Dr. Crahan's report:
[fn. 2] 2. Had the psychiatric evidence been offered by the defense, the court would have committed reversible error had it refused to receive it. (People v. Steele, 237 Cal.App.2d 182 [46 Cal.Rptr. 704].)
[fn. 3] 3. The theory that a mental disease or defect not amounting to legal insanity may negate the existence of an element of a crime is often called the theory of "diminished capacity." (People v. Anderson, 63 Cal.2d 351, 364 [46 Cal.Rptr. 763, 406 P.2d 43].)