[Crim. No. 20934. Apr. 10, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD EUGENE LANPHEAR, Defendant and Appellant.

[Crim. No. 21167. Apr. 10, 1980.]

In re RONALD EUGENE LANPHEAR on Habeas Corpus.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Supreme Court, Harold E. Shabo and Edward H. Schulman, Deputy State Public Defenders, for Defendant and Appellant and Petitioner.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Alan S. Meth, Jay M. Bloom, Michael D. Wellington and Harley D. Mayfield, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**MANUEL, J.**—Defendant Ronald Eugene Lanphear appeals from a judgment imposing the death penalty following his conviction of first degree murder. He also seeks a writ of habeas corpus based on allegations of ineffective representation by appointed trial counsel. The proceedings have been consolidated. We find no reversible error affecting the verdict of guilt or the finding of special circumstance. Challenged actions of trial counsel appear to be the product of informed tactical choices within the range of reasonable competence, and the trial court committed no prejudicial error in its evidentiary rulings or instructions to the jury. We conclude, however, that the part of the judgment imposing the death penalty must be reversed. The trial court improperly excluded prospective jurors where the voir dire failed to make it "unmistakenly clear" that the jurors "would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial," or that the jurors' attitudes toward the death penalty "would prevent them from making an impartial decision as to the defendant's *guilt*." (*Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 522-523, fn. 21 [20 L.Ed.2d 776, 785, 88 S.Ct. 1770].)

In November 1978 defendant was charged by information with the murder of Robert Unger in San Bernardino County on July 4, 1978. (Pen. Code, § 187.)[1] The information alleged the use of a firearm in the commission of the offense (§ 12022.5) and that the murder was committed under "special circumstances" in that it was willful, deliberate and premeditated, and personally committed during the commission of a robbery. (See former § 190.2, subd. (c)(3)(i).)[2] It also included "aggravation allegations"[3] of two other murders, an escape, and two prior robbery convictions.[4]

---

[1] Unless otherwise indicated, all section references hereafter are to the Penal Code.

[2] This case arises under the 1977 death penalty legislation (Stats. 1977, ch. 316, pp. 1255-1266) which has been superseded by the 1978 initiative, currently codified as sections 190 to 190.5.

[3] Section 190.3 provides in pertinent part: "...Except for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty, no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time, as determined by the court, prior to the trial...."

[4] Before trial the prosecutor agreed he would neither attempt to impeach defendant with the priors nor prove either of them. They played no part in the trial.

At the guilt phase of the trial, the jury returned verdicts finding defendant guilty as charged and the special circumstance and use allegations to be true. No new evidence was introduced by either party at the penalty phase, and the jury returned a verdict of death. The trial court denied a motion for a new trial and an application for reduction of sentence (§ 190.4, subd. (e)). Defendant was sentenced to death; this appeal is automatic (§ 1239).

## STATEMENT OF THE CASE

Defendant escaped from jail in Elk Point, South Dakota in the night of July 8-9, 1978. He joined a friend, Diana Geisinger, in Sioux City, Iowa, and the two made plans to go to Texas and eventually to marry in Las Vegas. Diana "borrowed" an automobile, a 1967 Camaro, from a friend, and with $30 between them defendant and Diana left Sioux City. Defendant had a gun which he had taken from the guard in the escape. At the time, Diana was seven months pregnant.

Diana was the prosecution's chief witness. She testified to the events of the five-day journey which culminated in the murder of Unger on July 14. She related that defendant committed other crimes during the trip, that they spent two days in Glendale, Arizona with her brother, and that, with about $60, they went to Las Vegas on July 13.

After gambling in the casinos, they left Las Vegas heading toward California and stopped at a rest area on the Nevada side of the border. Having only a few cents between them, their intention was "to find some credit cards and some more money." They slept on picnic tables that night and on the following morning, July 14, still at the rest stop, continued to discuss ways in which to obtain money. Diana was told to ask a lady for a ride. When the woman refused, defendant asked a couple for a ride. The man said yes, but the woman declined. Unger then came to a nearby water fountain; defendant asked him for a ride "up the road" for gas. When Unger agreed, defendant and Diana got into Unger's vehicle, a green Matador with Ohio plates. Defendant sat in the front passenger seat with the revolver lying beside him wrapped in an orange towel. Diana sat in the back.

As they drove defendant kept asking Diana if she was all right. That was a cue to stop the vehicle so she could get out: "I just told him that I didn't want to be around...[w]hen he killed him." Diana announced

that she felt sick and wanted out. She got out, went down a ditch, and feigned illness. She heard a shot, looked back, and saw defendant close the passenger door; he walked around to the driver's side, told her to stay put and that he would be back. Defendant drove off, but returned moments later. When Diana got in the back seat, Unger was still in the car. They drove down a dirt road and stopped in an area where defendant removed Unger from the car and placed him behind some bushes. Defendant then removed some coveralls from the trunk which he used to muzzle the gun and shot Unger two or three more times. Portions of Unger's personal effects were left by the body. Defendant went through the victim's pockets and took a wallet and watch. The two then drove back to the rest stop in Unger's car.

Blood from the Matador was removed and Unger's suitcases examined. Defendant transferred the license plates from the Camaro to the Matador. The couple returned to Las Vegas in the Matador. That night they gambled and stayed at the El Sombrero Motel. They sorted out Unger's property, including $200 in cash. The couple then drove back to Arizona where they lived with Diana's brother until late August or early September. Defendant obtained employment as a roofer.

In the weeks that followed their return to Arizona, the couple's relationship deteriorated and on October 8, 1978, Diana called the local police complaining that defendant had assaulted her. No charges were filed, but defendant moved out. On October 10, when he returned with Carolyn Williams to demand his "stuff," Diana informed him that she had thrown it away. Defendant told her that he would be back, that "I'd better dig myself a hole," and that "I'd be number four." After the incident Patsy Hall (Diana's neighbor) asked Diana what "all that" meant and Diana told her. Patsy and her son, a police cadet, persuaded Diana to talk to the police.

Detectives Adler and Stodell of the San Bernardino County Sheriff's office testified that they took Diana from Arizona to California on October 11, 1978. Enroute she pointed out the rest stop where she and defendant met Unger and, south of the state line in San Bernardino County, the location of his body.

Carolyn Williams testified that she first became aware that defendant may have been involved in murders when the police contacted her on October 12. By then defendant had left town. He contacted her that

evening and stated "that some things had happened that he wasn't proud of and someday we would sit down and have a long talk about it." He also stated "that in a couple of hours it was all going to be over with and that he was sending me a letter and would I do what he asked in the letter." He was crying and Carolyn believed he was going to commit suicide. On the following day defendant called again and stated he was in Las Vegas. He asked Carolyn to burn the letters if she received them because he had changed his mind about committing suicide and now "the letters did not mean anything."

Carolyn received a letter from defendant which contained envelopes addressed to Diana, the Peoria, Arizona Police Department and Linda Balyeat of Sioux City, Iowa. Carolyn turned the letters over to the police. The letter to the police contained defendant's statement that he was guilty of three murders—one in Kansas, one in California and one in New Mexico—and that Diana had nothing to do with participation in the crimes.

Defendant was arrested in Las Vegas on October 14, 1978. At the time of his arrest defendant had Robert Unger's watch and was wearing a pair of his shoes.

Deputy Sheriff Michael Stodell and Sergeant Adler took defendant from Las Vegas to San Bernardino County on October 17, 1978. During the trip, defendant volunteered the statement "You know, Diana is innocent. She'd have turned me in a lot sooner, if she hadn't been so scared."

Defendant took the stand and denied committing the offense. He testified that, enroute to Las Vegas on July 13, he and Diana discussed the possibility of trading the Camaro, and sometime around 9 p.m. Diana left the casino to trade or sell the automobile. She returned about three hours later with "quite a bit of money." She said she had traded the car but refused to discuss the details of the trade. She had a 1971 Matador. He first saw Unger's clothing in the morning at the El Sombrero Motel. Two or three weeks later he found the pants with the name inside and finally learned from Diana what had happened. She did not go into details but said that she had killed a girl hitchhiker and Unger. He took the Matador to a car wash and washed the blood out of the inside. He spray painted the car shortly after returning to Arizona because Diana told him she had stolen the car.

In regard to the events of the journey leading up to the homicide in California, defendant admitted the escape and a Kansas gas station robbery, but denied the murders. He testified he had escaped from Elk Point, stolen the pistol, and robbed a service station attendant in Emporia, but that Diana had killed the attendant. He got out of the car in Oklahoma and hitchhiked the rest of the way to Arizona where he rejoined Diana. He wrote the letter admitting the murders in Kansas, New Mexico, and California because he "did not care anymore."

Defendant testified that after the dispute with Diana about getting clothes, he told her "to find herself a hole and hide in it" and that was the end of the conversation, that from the time he left South Dakota until he was arrested in Las Vegas he never contemplated killing Diana and had not contemplated having her killed since his arrest.

On rebuttal, the prosecution called Ann Gifford, a friend of defendant, who testified that she conspired with defendant to find someone to "get rid" of Diana. She communicated with defendant by letter and telephone while he was incarcerated. From him she received several addresses for Diana, and from Diana's ex-husband she obtained a picture. Gifford's first contact refused to go through with the killing, and apparently her second contact was an undercover agent.

I

ISSUES RELATING TO GUILT PHASE

Defendant makes no claim that the evidence is insufficient to sustain his conviction for first degree murder or the finding of special circumstance. The only issue was the identity of the killer. The evidence establishes that the victim was killed to facilitate his robbery either by Diana or by defendant. The jury resolved the conflict in their testimony against defendant.

Defendant contends that trial counsel was incompetent and ineffective. He also contends that the trial court erred (1) in the admission of certain rebuttal evidence, (2) in its instructions on credibility, (3) in its comments to prospective jurors, and (4) in denial of a motion to voir dire the jury regarding trial publicity.

*Adequacy of trial counsel.*

■ ■■■ ■ Defendant asserts that trial counsel was ineffective and afforded him inadequate representation during the guilt phase

in that (1) he failed to object to the introduction of evidence of crimes other than the charged offense and (2) he failed to object to introduction of evidence by the prosecution in rebuttal.[5] While the record on appeal provides no explanation for counsel's conduct, uncontroverted declarations of the prosecutor and trial counsel filed with the petition for habeas corpus reveal the tactical basis for the failure to object.

The most damning evidence of prior crimes was Diana's testimony of two killings that occurred on the first and second days of their cross-country journey. Diana testified that they exhausted their funds for gas on the first day of the trip. On the night of July 9-10, defendant stopped at a gas station near Emporia, Kansas, intending to trade spare tires for gas and money. As defendant talked with the attendant, Diana used the restroom and then returned to the car. She heard two shots. Defendant ran to the car and they drove away. Defendant gave Diana about $200 and told her that he had shot the attendant in the head twice and killed him. He told Diana he would not have killed the attendant but "the guy started getting smart with him. He didn't like his attitude." Defendant also told her he did not want the attendant to be able to identify him.

In defendant's version of the events, he admitted robbing the attendant at gun point when the latter refused to exchange tires for cash. He did not kill the attendant, however, but returned to the car and related to Diana what he had done. She grabbed the gun lying on the console and went into the station. Defendant heard two shots. When Diana returned to the car she said, "I made damn sure nobody knew who did it."

---

[5] The challenge to counsel's competence in regard to rebuttal evidence is considered later in conjunction with discussion of the trial court's rulings thereon, *post*, page 835, footnote 10.

Only one allegation of ineffectiveness was contained in the petition for habeas corpus that was not also raised in the appeal itself. That related to counsel's failure to make a pretrial motion for change of venue. Counsel cannot be faulted in that regard. In support of the claim that counsel should have moved pretrial for a change of venue, defendant attaches copies of newspaper articles describing the account of the crime given to police by Diana, the investigation which ensued, the arrest and extradition of defendant from Las Vegas, and his arraignment and preliminary hearing. Our examination of the articles suggests that a motion to change venue would have been futile. The articles are not inflammatory. One was primarily a factual account of Diana's statement to police. The four others did no more than relate defendant's arrest and preliminary legal proceedings. There is no allegation that the articles in any way adversely affected the process for selection of jurors. San Bernardino County has almost a million residents; the newspaper in question has a circulation of between 89,000 and 91,000.

Diana testified that on the second day of the journey, after a four- or five-hour rest at a motel in Perry, Oklahoma, they proceeded toward New Mexico, where about 10 p.m. at a rest stop they agreed to give a ride to a young girl carrying a guitar case. The trio rode together for several hours, briefly conversing about guitars and money (the hitchhiker "bragged" about the money she had spent on the guitar and on her trip), and stopping at a coffee shop and then a bar. At some point Diana told defendant to let the hitchhiker out. Although she and defendant had not discussed it, Diana knew when defendant went over a viaduct off the highway that "he was going to get rid of her there." All three were in the front seat. Defendant got out, opened the passenger door, and asked Diana if she wanted out. She responded affirmatively so the hitchhiker got out first. The girl was shot in the back of the head. Defendant straddled her body and searched her pockets. Diana then observed defendant take the gun from his belt area; she looked away as the hitchhiker was shot a second time. Defendant threw the gun in the car and rolled the girl's body down the cliff. Diana, who was still in the car, was instructed to go through the hitchhiker's belongings. Drugs and papers were thrown away; they kept the guitar, which was later sold, and a coin purse containing $1.50.

Defendant denied involvement in the killing of the hitchhiker. He testified that after leaving the motel in Perry, Oklahoma, he decided to get out of the car and hitchhike to Arizona. He arranged to meet Diana at a bus station in Glendale, Arizona, and did meet her two days later on the evening of July 12. Defendant testified that he did not notice the guitar in the Camaro, saw it for the first time in the trunk of the Matador, assumed it was Diana's, and pawned it on her instructions.

Additional other-crimes evidence of which defendant complains is the South Dakota jailer's description of defendant's assault upon him during the escape, the evidence of the reasons for the incarceration in South Dakota (burglary and revocation of bail in three states), and Diana's testimony of a burglary and theft which occurred subsequent to the charged crime.

Defense counsel made no objection to the introduction of any of the above evidence. The jury was instructed in accord with CALJIC No. 2.50 as to the limited purposes for which the evidence was received. They were instructed that it was not received and could not be considered to prove bad character or disposition to commit crime.

The burden of proving a claim of inadequate trial assistance is on the defendant. "[A]ppellant must show that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates. In addition, appellant must establish that counsel's acts or omissions resulted in the withdrawal of a potentially meritorious defense." (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859].) *Pope* continues, "Once an appellant has met these burdens, the appellate court must look to see if the record contains any explanation for the challenged aspect of representation." If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, the judgment will be affirmed on appeal "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." (*Id.*, 23 Cal.3d at p. 426.)

The record on this appeal sheds no light on counsel's actions vis-à-vis the other-crimes evidence.[6] We have followed the procedure proposed in *Pope* (*id.*, p. 426) and issued an order to show cause upon defendant's petition for habeas corpus, filed contemporaneously with the appeal.

Generally, failure to make objections is a matter of trial tactics as to which we will not exercise judicial hindsight. (*People* v. *Beagle* (1972) 6 Cal.3d 441, 458 [99 Cal.Rptr. 313, 492 P.2d 1].) "[C]ounsel's conduct should not be judged by appellate courts in the harsh light of hindsight...and except in rare cases, an appellate court should not attempt to second-guess trial counsel." (*People* v. *Thomas* (1974) 43 Cal. App.3d 862, 869 [118 Cal.Rptr. 226].) "It is not sufficient to allege merely that the attorney's tactics were poor, or that the case might have been handled more effectively...Rather, the defendant must affirmatively show that the omissions of defense counsel involved a critical issue, and that the omissions cannot be explained on the basis of any

---

[6]We are aware that the guidelines of *Pope* provide for a two-step analysis. In addition to establishing that reasonably effective counsel would have objected to the evidence in question, defendant must show that failure to do so deprived him of a potentially meritorious defense. It is not readily apparent what defense was foreclosed by counsel's failure to object to the other crimes evidence. (Cf. *People* v. *Nation* (1979) 26 Cal.3d 169 [161 Cal.Rptr. 299, 604 P.2d 1051], where the sole issue was validity of the pretrial identification of defendant as the rapist; counsel's failure to object to the critical identification evidence deprived defendant of constitutionally adequate assistance.) We nevertheless assume for the purpose of this opinion that defendant has met the burdens outlined in *Pope* and proceed to an examination of possible justification for counsel's actions.

knowledgeable choice of tactics." (*People* v. *Floyd* (1970) 1 Cal.3d 694, 709 [83 Cal.Rptr. 608, 464 P.2d 64]; see also *People* v. *Williams* (1970) 2 Cal.3d 894, 905 [88 Cal.Rptr. 208, 471 P.2d 1008]; *In re Williams* (1969) 1 Cal.3d 168, 176 [81 Cal.Rptr. 784, 460 P.2d 984]; *People* v. *Hill* (1969) 70 Cal.2d 678, 690-691 [76 Cal.Rptr. 225, 452 P.2d 329]; *People* v. *Reeves* (1966) 64 Cal.2d 766, 773 [51 Cal.Rptr. 691, 415 P.2d 35]; *People* v. *Brooks* (1966) 64 Cal.2d 130, 140 [48 Cal.Rptr. 897, 410 P.2d 383]; *People* v. *Fitzgerald* (1972) 29 Cal. App.3d 296, 310 [105 Cal.Rptr. 458]; *People* v. *Brunt* (1972) 24 Cal. App.3d 945, 957 [101 Cal.Rptr. 457]; *People* v. *Perry* (1969) 271 Cal. App.2d 84, 114-115 [76 Cal.Rptr. 725]; *People* v. *Powers* (1967) 256 Cal.App.2d 904, 917 [64 Cal.Rptr. 450].)

In the petition for habeas corpus, appellate counsel attempts to meet the thrust of the above cited cases and seeks to demonstrate that trial counsel's actions resulted from his failure to research the law or investigate the facts in a fashion required by a diligent, conscientious advocate. Appellate counsel asserts that "one can hardly imagine a more damning and prejudicial parade of horrors than the other-crimes evidence presented in this case," and submits that there simply could be no satisfactory explanation for trial counsel's inaction. As will appear, the prosecutor and trial counsel were totally cognizant of the prejudicial nature of the evidence and shared appellate counsel's concerns as to its potential effect.

Appellate counsel first makes a reasoned argument based on statutory and decisional authorities that the evidence of the two prior murders was inadmissible on the particular facts of this case or, if technically admissible, nevertheless excludable because it was merely cumulative and its prejudicial effect was far greater than its probative value. However, since no objection was made to the evidence, its admissibility as such is not reviewable (Evid. Code, § 353, subd. (a)), and since we conclude that counsel was not inadequate in his representation of defendant, we need not and will not engage in speculative discourse on the possible admissibility of the evidence to prove intent, motive, or identity, a matter discussed at length in the briefs of appellate counsel and the Attorney General.

In the declaration that accompanies the petition for habeas corpus trial counsel states that he made no objection to the other-crimes evidence because he thought it was admissible to show common plan or

scheme, "that is, that the only way to get across country was to steal and rob."[7] Counsel also felt that the other-crimes evidence did not pertain to defendant "because he had an alibi defense and had said he was not there."[8] Counsel's explanation is somewhat ambiguous but suggests that he had tactical reasons for failing to object.

In the return to the order to show cause, the Attorney General submits declarations of both trial counsel and the deputy district attorney who prosecuted the case. Trial counsel states that 75 percent of his 30 years of practice has been in criminal law, that he has represented 75 to 100 defendants accused of homicide, including 25 who faced first degree murder charges, and that he objects to evidence of other crimes whenever he believes it is in his client's interest. Counsel recalled a pretrial conference at which the subject of admitting the Kansas and New Mexico murders was discussed. It was his opinion after that conference that the evidence was admissible, and if not admitted at the guilt phase, it would be admitted at the penalty phase.

The declaration of the district attorney states that it was his professional judgment that the jury would convict defendant without hearing of the Kansas and New Mexico murders and that the effect of those murders on the jury would be enhanced if they were not mentioned until the penalty phase. He was concerned, however, that withholding the evidence until the penalty phase would be unfair and, because withheld, might be barred. He raised the subject at a pretrial conference, first laying his case before the court and trial counsel, showing the court that it would be virtually impossible to separate statements of other killings from the letter of confession written by defendant, and indicating

---

[7]The only indication that defendant commenced his cross-country journey with theft and robbery in mind was his own testimony that he assured Diana before they started out that "I can always rob and steal...."

[8]Trial counsel's complete declaration as to the "other crimes" was as follows: "That I made no objection to the other-crimes evidence nor to the District Attorney's opening argument regarding 'cross-country killings' because I believed that the evidence was admissible to show common plan or scheme, that is, that the only way to get across country was to steal and rob; that I did not consider asking the court to sever irrelevant from relevant portions of the other-crimes evidence nor asking the court to delete the details concerning the other-crimes evidence; that I believe there was an in-chambers discussion of the other-crimes evidence prior to trial wherein the trial judge had indicated his willingness to sentence the defendant, on a plea of guilty, to life without possibility of parole, an offer which the District Attorney refused out of hand; that I did not believe the other-crimes evidence pertained to appellant because he had an alibi defense and had said he was not there; that there was no reason for not limiting the CALJIC instruction (CALJIC 2.50) regarding the other-crimes evidence;..."

that the prior murders were needed to explain Diana's actions at the time of the charged crime. There followed a discussion of possible legal reasons for admitting the evidence, to show identity, motive and intent. Defense counsel then indicated that the defense would be alibi and noted that he would cross-examine Diana at least as to the New Mexico killing.

According to the declaration, the trial court reviewed the statutory death penalty procedures and stated that the prior murders would be admissible during the penalty phase. Trial counsel then expressed concern at springing the other two killings on the jury at such a late point in the trial and stated that if they were admissible for any purpose within the trial they should be presented during the guilt phase so that both parties could voir dire the jury about them and lessen the impact by being straightforward and honest with the jury from the beginning.

The uncontroverted facts described in the declarations of trial counsel and the prosecutor illustrate that both had an interest in the timing of the admissions of the prior murders. Defense counsel was caught in a cruel dilemma: If the prior murders were introduced for the first time when the jury was considering penalty alone, the impact would be such as to make the penalty of death a foregone conclusion. On the other hand, as noted earlier, credibility was a primary factor in this case, and admissions by Diana that she accompanied defendant through two murders, stayed with him, and shared the proceeds do not tend to enhance her credibility. Those admissions permit defendant to paint her a killer capable of killing Unger and blaming him. We cannot say that the trial counsel's actions were not the product of informed tactical choice within the range of reasonable competence.

Defendant makes four assignments of prejudicial error in the rulings and instructions of the trial court:

*Admission of evidence of conspiracy to kill witness.*

Defendant contends that the trial court erred in permitting the prosecution, over objection, to cross-examine defendant and to present rebuttal evidence concerning his complicity in the plot to kill Diana.

From the record, we present a brief chronology of the events leading to the testimony of Ann Gifford that she conspired with defendant to

kill Diana: The prosecutor heard from South Dakota authorities on February 16, 1979, that Diana might be in danger; she was placed in protective custody. The prosecutor heard no more until the night of the 21st when he was informed that undercover agents had tape-recorded a conversation with Ann Gifford in which she solicited an agent to kill Diana. On the following day, February 22, the prosecutor was notified that Ann Gifford had been arrested and in a statement to police had implicated defendant in the plan to kill Diana. Earlier on the same day, February 22, the prosecution had rested its case. Defense counsel was immediately informed of Gifford's arrest and the potential involvement of defendant. Gifford had been one of the witnesses subpoenaed by the defense, and when trial recommenced on February 26 for presentation of the defense case, defense counsel mentioned the nonavailability of his first witness, Gifford, and advised the court of what he had learned from the prosecutor concerning her arrest and defendant's possible involvement. The court inquired of the prosecutor whether he intended to reopen his case-in-chief to introduce the evidence he had. The district attorney responded:

"No, your Honor, I do not. The only time that this information may become relevant is in regard to potential bias or prejudice of any other people who are involved. And obviously, right now the only person that would include is the Defendant.

"Realistically, *it is the kind of information that I think that the aggravation phase is really directed at.* And *unless for some reason,* and I would advise the court before getting into it, *unless for some reason the defense case opened up the subject,* I wouldn't anticipate getting into this unless the special circumstances were found true and we proceeded to the aggravation." (Italics added.) The court thereupon told the prosecutor to keep the defense advised as matters developed, and the record reveals that throughout the remaining portion of the trial the prosecutor did so.

The defense then called its witnesses, among them the defendant. The last question on direct examination of defendant was: "From the time you left Elk Point until you were arrested in Las Vegas, did you ever contemplate killing Diana Geisinger?" Defendant responded in the negative. The first question on cross-examination was: "Since the time of your arrest, have you contemplated having Diana Geisinger killed?" The answer was in the negative. Sometime later, the prosecutor in-

formed the court and defense counsel that he intended to cross-examine defendant and if necessary present other witnesses to elicit evidence of defendant's communications with Ann Gifford. The evidence was to be offered to show defendant's efforts to suppress evidence, indicating a consciousness of guilt in the killing of Unger.

Defense counsel's objection that the cross-examination would exceed the scope of direct was overruled by the trial court. The court noted defendant's testimony that he had nothing to do with the crime and ruled that the evidence was admissible to show consciousness of guilt. Counsel then objected under Evidence Code section 352 that the evidence was too prejudicial. After additional discussion concerning the intelligibility of Gifford's tape recording and the admissibility of evidence concerning the plot to show consciousness of guilt, the court stated, "The fact that it might tend to persuade the jury that the Defendant is guilty is of course no grounds for keeping it out. The evidence insofar as it has been revealed to me appears to have great probative value. It appears to relate to the conduct by the Defendant, himself, not to the conduct by other people on his behalf or unbeknownst to him."[9] About the same time, the court asked for an offer of proof as to Ann Gifford's potential testimony and, before permitting the prosecutor to proceed with the cross-examination of defendant, noted "...I am satisfied that the District Attorney has acted in the utmost good faith from the very beginning in this matter in furnishing the defense counsel everything he had, every bit of information that was available as it became available. And I would assume that he would continue to do so...."

Defendant contends that the cross-examination violated his privilege against self-incrimination in that it exceeded the scope of the direct examination. (*People* v. *Schader* (1969) 71 Cal.2d 761, 769 [80 Cal. Rptr. 1, 457 P.2d 841].) He notes that defendant never mentioned Ann Gifford in his testimony and that the question on direct which concerned contemplation of harm to Diana related to a fixed period of time preceding his arrest. The contention is spurious. Although a defendant cannot be compelled to be a witness against himself (Cal. Const., art. I, § 15), if he "takes the stand and makes a general denial of the crime

---

[9]The court's statement answers a contention made by defendant on appeal that the court never ruled on the section 352 motion. The section 352 motion was renewed when Gifford was called to the stand. The court denied the motion, stating "The court feels that the evidence which has been proposed is of great probative value and is a proper subject of inquiry before the jury."

with which he is charged the permissible scope of cross-examination is very wide"; cross-examination does not have to be confined "to a mere categorical review of the matters, dates, or times mentioned in the direct examination. . . .'A defendant cannot. . . limit the cross-examination to the precise facts concerning which he testifies.'" (*People* v. *Zerillo* (1950) 36 Cal.2d 222, 227-229 [223 P.2d 223]; see also *People* v. *Saddler* (1979) 24 Cal.3d 671, 679 [156 Cal.Rptr. 871, 597 P.2d 130]; *People* v. *James* (1976) 56 Cal.App.3d 876, 888 [128 Cal.Rptr. 733].)

■ Defendant also contends that evidence of his alleged participation in the conspiracy to kill Diana was improper rebuttal under section 1093, subdivision 4 which provides that after the prosecution and defense have offered their evidence, "The parties may then respectively offer rebutting testimony only, unless the court, for good reason, in furtherance of justice, permits them to offer evidence upon their original case."

The thrust of this argument is that the district attorney acted in bad faith and withheld evidence of the possible conspiracy during the case-in-chief even though he had knowledge of it and of defendant's involvement. It is apparent from the chronology presented earlier that, although the prosecutor was aware of some danger to Diana from the communication on February 16, it was not until after he rested his case that he received evidence of defendant's connection with the conspiracy. Until that time, the evidence was irrelevant as to defendant (see *People* v. *Hannon* (1977) 19 Cal.3d 588, 599 [138 Cal.Rptr. 885, 564 P.2d 1203]); and from then on the prosecutor was entirely candid as to the potential use of the information and furnished the details to defense counsel as they became available to him. The trial court's finding that the prosecutor acted in good faith is supported by the record. Defendant cannot legitimately claim surprise.

■■■ ■■■ Although a crucial witness known and available to the prosecution should be called during the case-in-chief (*People* v. *Carter* (1957) 48 Cal.2d 737, 753-754 [312 P.2d 665]), circumstances may make that order of proof impossible. The order of proof lies within the sound discretion of the trial court (§ 1094; *People* v. *Mosher* (1969) 1 Cal.3d 379, 399 [82 Cal.Rptr. 379, 461 P.2d 659]), and on the particular facts of this case we find no abuse of discretion in

permitting the rebuttal evidence either for impeachment or as part of the case-in-chief out of order.[10]

*Failure to tailor the instruction regarding credibility of witnesses.*

■ Although the trial court might have, or should have, as defendant asserts, deleted from the instruction (CALJIC No. 2.20)[11] portions that were inapplicable, defendant has failed to establish a reasonable probability that a different verdict would have been rendered in the absence of the phrases complained of.

*Denial of motion to voir dire jurors during trial.*

■ During the trial a newspaper article reported the alleged conspiracy to kill Diana. It is contended that the court's refusal to engage in requested voir dire constituted prejudicial error. Defendant's reliance on *People* v. *Lambright* (1964) 61 Cal.2d 482 [39 Cal.Rptr. 209, 393 P.2d 409] is misplaced. In *Lambright* the judge instructed the jury they had the right to read and hear the publicity concerning the trial but must not consider such evidence in their deliberations. In *Lambright* the media published an account of testimony as to statements by defendant threatening his subsequent victim's life despite the court's ruling that it was inadmissible hearsay.

In contrast, throughout the trial of the case at bar the jury were admonished not to read newspapers, and when forewarned that the papers were going to print an article about the conspiracy, the trial court took

---

[10]Defendant also challenges the adequacy of counsel in several respects in failing to object to rebuttal evidence. First, as to the testimony of Gifford, it is urged that counsel should have objected to the testimony as violative of the "order of proof" provisions of section 1093, subdivision 4 in addition to repeating the motion under Evidence Code section 352 that its prejudicial effect outweighed its probative value. As explained above, the trial court did not abuse its discretion in permitting the prosecution to call Ann Gifford after defendant's case was completed. We see no incompetence of counsel under the guidelines of *Pope* in counsel's failure to make the specific objection that appellate counsel suggests.

Second, trial counsel's failure to object to introduction in rebuttal of the coveralls allegedly used to muzzle the gun used to kill Unger does not meet the level of incompetency decried in *Pope*. We see no "potentially meritorious defense" withdrawn from defendant by trial counsel's failure to object.

[11]CALJIC No. 2.20 tells the jury that in determining the credibility of a witness they may consider any matter that tends to prove or disprove truthfulness. Among the listed considerations are: "His character for honesty or veracity or their opposites," and "His prior conviction of a felony."

special pains to warn the jury not to read the press or listen to the radio. In the absence of any evidence that any of the jurors failed to heed its admonishments, we cannot say that the trial court abused its discretion in determining, after considering the alternatives, that it would be best not to emphasize the matter by polling the jury.[12]

*Trial court's comments to prospective jurors.*

■ Defendant contends that comments by the court to prospective jurors (expense of trial to taxpayers; district attorney was of opinion that defendant was guilty; defendant would be subject to parole on finding of first degree murder without special circumstance; jury's decision reviewable by a judge and by appellate review) were improper and prejudicial. We reject the contention. Defendant neither objected to the comments nor has he shown any prejudicial effect.

Each of the comments must be considered in context: When addressing the prospective jurors the trial court outlined in detail the procedures to be followed and emphasized their obligation as jurors to make the decision. Although the court noted in passing that the jury's decision was subject to reviews by him and by the Supreme Court, the court emphasized again and again that the ultimate decision was the jury's.

The court did not, as defendant charges, repeatedly refer to the prosecutor's belief in defendant's guilt. When describing an information, the "piece of paper" that is prepared by the district attorney's office, the court stated several times that the information was no evidence whatsoever of guilt, that although somebody "thinks he's guilty" to start the process, "what we are here for is to find out whether those charges are true, not whether somebody thinks they are true."

On two occasions, while informing the jurors of the decisions they would be required to make the court told the jury that if defendant were found guilty of first degree murder without special circumstance the penalty would be life imprisonment with possibility of parole. The

---

[12]As stated in *Lambright*, "In a case where the jury is correctly admonished not to receive newspaper or other extrajudicial reports of the trial, it may be a proper exercise of discretion for the trial court to refuse to poll the jury regarding any specific news media account of the trial. [Citations.] In such a situation it may be presumed in the absence of a showing of misconduct that the jury heeded the court's admonition." (61 Cal.2d at pp. 486-487.)

court in no way suggested that they consider the possibility of parole in their determinations. (Contrast, *People* v. *Morse* (1964) 60 Cal.2d 631, 636 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810], where the jury was instructed that they might consider the possibility of parole in reaching their verdict.)

And, finally, on several occasions prospective jurors or trial jurors were admonished on their duty to follow the law and not to engage in misconduct which might require a mistrial. The court noted that retrials were difficult and unfair to the parties and to the taxpayers. In no way did the court suggest that the expense of trial was relevant to defendant's guilt or innocence.

As noted above, no objections were made to any of the remarks. And in view of the overwhelming evidence in support of the verdict, we discern no possible prejudice to defendant.

## II

### Issues Relating to Penalty Phase

■■■ In the course of jury selection, eight prospective jurors expressed objections to the death penalty. Defendant contends that exclusion of three of these jurors (Holley, Hayter and Herkelrath) was contrary to the standards established in *Witherspoon* v. *Illinois, supra*, 391 U.S. 510, and deprived him of his constitutional right to an impartial jury. We agree as to exclusion of jurors Holley and Hayter.

To determine the juror attitudes concerning the death penalty, the court preliminarily remarked to the first two panels: "Now, back to the problem at hand. When we come to the business of the death penalty, the law requires that since a jury is going to have to wrestle with this decision that the jury be able to wrestle with the decision. It would not be appropriate for us to have someone on the jury whose religious beliefs or moral feelings, or whatever source of beliefs are such that under no circumstances, no matter what the facts were, no matter what happened, could they even take part in any deliberations that might lead to a death penalty.

"If anybody has feelings that are that strong, then obviously, they should not serve on a jury. Because before we even start, we are in a po-

sition where we are going to maybe have a hung jury or could not possibly arrive at the possible alternatives no matter what the evidence shows.

"And I understand that there are some religions I have heard people say, that there are some people who for religious beliefs, whatever they feel they just cannot take part in any such deliberations. And I would like a show of hands of all of you who feel that your personal convictions or personal beliefs or whatever are such that you could not under any circumstances no matter what the evidence showed, even take part in the deliberations which might lead to a death penalty. If so, raise your hands?"

After individual questioning, two jurors were excused when they affirmatively voiced the inability to participate in deliberations which might lead to a death verdict, regardless of the facts or circumstances of the case.

Thereafter the following exchanges took place:

"MR. HOLLEY: Your Honor?

"THE COURT: Yes, sir?

"MR. HOLLEY: Mr. Holley, number 37. If the trial came to the third stage that you spoke of, where there was a choice between life and death sentence, does the jury have any degree of selection there?

"THE COURT: It is absolutely up to the jury.

"MR. HOLLEY: I mean—

"THE COURT: —what I'm telling you, now, has nothing to do with what your decision would be. That is entirely up to the jury. All we want to know is that you would be capable of taking part in deliberations, which may eventually end up with the vote for the death penalty?

"MR. HOLLEY: I don't believe I could, sir.

"THE COURT: I appreciate that, Mr. Holley, is it?

"MR. HOLLEY: Yes, sir.

"THE COURT: Thank you, you are excused, would you go to the jury assembly room and let them know?

"That was Wesley Holley, number 37.

"Anyone else? If you have any feelings that you think would prevent your taking part in deliberations which might lead to the death penalty, if your feelings are that strong, why let us know.

"Yes, sir?

"MR. HAYTER: Sir, I don't believe that I could.

"THE COURT: What is your name?

"MR. HAYTER: H - a - y - t - e - r, 33.

"THE COURT: In the first group. All right, is this because of your personal convictions or religious beliefs or what?

"MR. HAYTER: Religious beliefs, I'm a born again Christian. I just don't believe that I could have any part in sitting in on the electric chair, sending anyone.

"THE COURT: Incidentally, Mr. Broderick [defense counsel], I haven't asked you on these other cases if you want to question any of these people further before I excuse them, why if you let me know, I will give you that privilege.

"MR. BRODERICK: I will, your Honor.

"THE COURT: All right, sir, thank you, Mr. Hayter. You are excused, would you go to the jury assembly room and let them know." The court asked if there was anyone else, and there was no further response.

Later, from the third panel, three jurors were excused who responded affirmatively to the question whether their feelings about the death penalty were such that under no circumstances would they be able to participate in deliberations which might lead to the death penalty. Thereafter, general questioning resumed, and jurors were queried as to

their association with law enforcement agents or agencies and possible bias or prejudice. The following colloquy ensued with juror Herkelrath:

"Mr. Herkelrath: I worked for the City for 25 years. And I am pretty well acquainted with an awful lot of policemen at that time and sheriffs.

"The Court: What is your name, sir?

"Mr. Herkelrath: Herkelrath.

"The Court: Yes, how long have you been retired?

"Mr. Herkelrath: Nine years.

"The Court: Is there anything about your having known a lot of policemen that might affect your decision in this case?

"Mr. Herkelrath: Well, I don't know. I mean, I have never been in that position. It is hard to answer right off the top until you hear all the evidence. But I would hate to sit on a jury that extensive and I don't mind sitting on other types of cases, but a man's life is at stake. I hate to sit on that kind of a jury.

"The Court: Well, in view of your background, Mr. Herkelrath, I will excuse you. Go to the jury assembly room and let them know."

Defendant contends that Holley, Hayter, and Herkelrath gave equivocal responses to the death penalty inquiries and were improperly excused, that counsel's failure to object does not waive the error, and that failure to object constituted ineffective representation. As will appear, we agree as to jurors Holley and Hayter.

 *Witherspoon* holds that prospective jurors with scruples against the death penalty may not be excused for cause on that basis unless they have made it "unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them; or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*" (391 U.S. at pp. 522-523, fn. 21 [20 L.Ed.2d at p. 785]; (italics in original.)

■ We are compelled by *Witherspoon* and its progeny to recognize certain principles said to flow therefrom. Thus, expression of scruples against the death penalty or abhorrence or distaste for sitting on a jury that is trying a capital case is not sufficient; the juror must indicate that his beliefs or feelings will automatically, whatever the circumstances, prevent him from voting for the death penalty or will affect his determination of the defendant's guilt. (*Id.*, at pp. 522-523, fn. 21 [20 L.Ed.2d at p. 785]; *People* v. *Williams* (1969) 71 Cal.2d 614, 628 [79 Cal.Rptr. 65, 456 P.2d 633]; *People* v. *Vaughn* (1969) 71 Cal.2d 406, 416 [78 Cal.Rptr. 186, 455 P.2d 122]; *People* v. *Risenhoover* (1968) 70 Cal.2d 39, 56 [73 Cal.Rptr. 533, 447 P.2d 925].) Further, when a seemingly unambiguous answer follows a question that is itself vague or unspecific in *Witherspoon* terms, the reviewing court must determine whether there is any possibility that the juror construed the question in such a manner as to render the answer ambiguous in *Witherspoon* terms. (*Williams, supra*, 71 Cal.2d at pp. 628-629.)[13] And, finally, conclusionary-type responses or responses hedged by equivocal phrases such as "I think," "I don't think" or "I don't believe" have been held insufficient basis for exclusion. (*People* v. *Chacon* (1968) 69 Cal.2d 765, 772-773 [73 Cal.Rptr. 10, 447 P.2d 106, 34 A.L.R.3d 454]; *People* v. *Osuna* (1969) 70 Cal.2d 759 [76 Cal.Rptr. 462, 452, P.2d 678]; *People* v. *Vaughn, supra*, 71 Cal.2d at pp. 415-416; *In re Hillery* (1969) 71 Cal.2d 857, 863 [79 Cal.Rptr. 733, 457 P.2d 565]; see also *Maxwell* v. *Bishop* (1970) 398 U.S. 262, 264-265 [26 L.Ed.2d 221, 223-224, 90 S.Ct. 1578]; *People* v. *Stanworth* (1969) 71 Cal.2d 820, 835-838 [80 Cal.Rptr. 49, 457 P.2d 889]; *In re Hill* (1969) 71 Cal.2d 997, 1016-1019 [80 Cal.Rptr. 537, 458 P.2d 449].)

■ Each prospective juror must satisfy the requirements of *Witherspoon* (*People* v. *Washington* (1969) 71 Cal.2d 1170, 1177 [81 Cal. Rptr. 5, 459 P.2d 259, 39 A.L.R.3d 541]), and although the context in which a response is made may add to the degree of certainty of a juror's response (*People* v. *Varnum* (1969) 70 Cal.2d 480, 493 [75 Cal.Rptr. 161, 450 P.2d 553]; also *People* v. *Floyd, supra*, 1 Cal.3d 694, 723; *In re Tahl* (1969) 1 Cal.3d 122, 136-137 [81 Cal.Rptr. 577, 460 P.2d

---

[13]We stated in *Williams*: "... When a juror is excluded for cause on the basis of an answer which is not phrased in these terms [i.e., that would automatically vote against the death penalty no matter what the trial might reveal], his exclusion should be considered erroneous and grounds for reversal of the penalty determination unless it is clear 'beyond a reasonable doubt' that this error was harmless—i.e., clear 'beyond a reasonable doubt' that his answer could only be construed as meaning the same thing as the answer *Witherspoon* requires." (*Id.*, at fn. 2.)

449]; *In re Hill, supra,* 71 Cal.2d 997, 1019), "no amount of reference to responses given by other veniremen or to comments by the court or counsel can serve to make certain the meaning of the venireman's response" (*Hill, supra,* '71 Cal.2d at p. 1019) in the absence of an indication that the juror *intends* his answer to state that he could *never* impose the death penalty.

 With these general principles in mind and after a few preliminary comments, we examine the voir dire of jurors Holley, Hayter, and Herkelrath. The court itself conducted the entire voir dire, properly summarized the decisions which the jury would be called upon to make, and sought affirmance by a show of hands as to the prospective jurors' inability to "even take part in deliberations" which might lead to the death penalty. Significantly, despite the apparent affirmance by show of hands on the part of the first two excused jurors, the court, as to one of them, repeated the question whether her opposition to the death penalty would make it impossible under any circumstances to deliberate on defendant's guilt and, as to the second juror, assured itself that the juror subscribed to the court's preliminary statement "one hundred per cent."

Immediately thereafter, juror Holley raised his hand, whether in affirmance or in order to get the court's attention to propound a question is not clear.[14] When Holley's question had been asked and answered, the court did not repeat the *Witherspoon* questions as it had done with the previous jurors, but instead stated that all it wanted to know was whether Holley was "capable of taking part in deliberations." To this unrefined question, not phrased in *Witherspoon* terms, Holley responded with an equivocal, "I don't believe I could."

Holley's initial question to the judge concerned the third, the death penalty stage of the deliberations. He wanted to know if at that stage the jurors had any degree of selection. After assuring Holley that the choice was entirely the jury's, the court pressed for an indication of Holley's "capability" to engage in deliberations. By this time it is not clear what deliberations are being referred to, and it is also unclear if Holley construed the question as an inquiry as to his feelings, distaste, or abhorrence concerning a capital case or as to his inability to do other

---

[14]It is precisely because of possible ambiguity in the conduct that we reject the Attorney General's suggestion that the raising of the hands was assertive conduct on the part of the jurors which, *in itself,* establishes an unequivocal affirmative answer to the question sufficient to make it unmistakably clear they could not be impartial on the issue of guilt.

than automatically vote against the death penalty. The equivocal question evoked an equivocal answer. As noted in *Williams* (71 Cal.2d at pp. 633-634), the Supreme Court in *Witherspoon* spoke with precision, specifying the ultimate question and supplying the required answer, and we must therefore regard "with considerable suspicion and disfavor any exclusion of a juror...which is not based on a question phrased in the terms *Witherspoon* so unmistakably suggests."

Somewhat reluctantly we hold that the exclusion of juror Holley was error.

Juror Hayter was next. Apparently Hayter was not among those who initially raised their hands. But when the court asked whether any prospective juror had "any feelings that you think would prevent your taking part in deliberations which might lead to the death penalty," Hayter responded "I don't believe that I could." He then indicated his religious beliefs ("born-again Christian") and again stated "I just don't believe I could have any part in sending anyone to the electric chair [*sic*]." "I don't believe I can" or "I just don't believe I could" are not the unequivocal affirmation required by California cases interpreting *Witherspoon.* (See *People* v. *Velasquez* (1980) 26 Cal.3d 425, 440 [162 Cal.Rptr. 306, 606 P.2d 341] ["most likely"]; *People* v. *Osuna, supra,* 70 Cal.2d 759, 769 ["I guess I feel strongly"]; *People* v. *Chacon, supra,* 69 Cal.2d 765, 772 ["I don't think so"]; *People* v. *Vaughn, supra,* 71 Cal.2d 406, 415-416 ["I think," "I feel," "I believe," "I am afraid"]; *People* v. *Risenhoover supra,* 70 Cal.2d 39, 55-56 ["I don't know if I could possibly," "I don't feel I would"] where answers hedged in quoted phrases were held to be too equivocal for excusal pursuant to *Witherspoon.*) *Velasquez* and the other cited cases compel the exclusion of juror Hayter as well as juror Holley.

Juror Herkelrath presents a different situation. He was in a third panel of prospective jurors and did not come to the court's attention during *Witherspoon* questioning. While being examined concerning his association with law enforcement officers and its possible effect on his impartiality, Herkelrath gave a very ambiguous response. He stated he did not know whether it would affect his decision ("hard to answer right off the top, until you hear all the evidence"). Then his emphasis shifted to the fact that this was a capital case and his statement thereafter can be interpreted to mean that his association could have an effect in this type of case. He expressed some distaste for sitting in a capital case but

he did not express opposition to the death penalty on any grounds nor did he state that it would affect his vote.

Defendant argues that the trial court had a duty at this point under *Witherspoon* to clarify Herkelrath's response to avoid any ambiguity as to whether the prospective juror's concern for imposing the death penalty was a by-product of a possible bias in favor of the prosecution due to his former associations or whether he had personal scruples against the death penalty.

The court excused Herkelrath because of his "background" which, in this context, must refer to prior association with law enforcement officials. Defendant does not contend that the excusal was improper on this ground. *Witherspoon* is therefore inapplicable here.

■ There remains the question whether defendant waived the *Witherspoon* error as to jurors Holley and Hayter in failing to object to their excusal. This court recently addressed the question in *People v. Velasquez, supra,* 26 Cal.3d 425, 443. Under the rule adopted by the majority in that case, we conclude that counsel's failure to object to the excusals here does not bar the claim of error.

The erroneous exclusion of jurors Holley and Hayter requires us to reverse the judgment insofar as it relates to penalty. We therefore need not and do not resolve the other contentions raised by the defendant relating to the penalty trial.

The judgment is reversed insofar as it relates to penalty. In all other respects the judgment is affirmed. The order to show cause is discharged and the petition for writ of habeas corpus is denied.

Bird, C. J., Tobriner, J., Mosk, J., Richardson, J., and Newman, J., concurred.

**CLARK, J.**—I dissent from the majority opinion insofar as it holds defendant did not waive the *Witherspoon*[1] error as to jurors Holley and Hayter by failing to object to their excusal. As the majority indicate, the question whether failure to object constitutes waiver of *Witherspoon* error was recently resolved by this court in *People v. Velasquez* (1980) 26 Cal.3d 425 [162 Cal.Rptr. 306, 606 P.2d 341]. "The decisions of the

---

[1]*Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770].

United States Supreme Court and of the California courts have unanimously ruled that *Witherspoon* error is not waived by mere failure to object." (*Id.*, at p. 443.)[2]

As will be shown, the cases cited do not support this proposition. Review on appeal is not precluded by failure to object at trial when the law is substantially changed in the interim. (See, e.g., *People* v. *De Santiago* (1969) 71 Cal.2d 18, 22-23 [76 Cal.Rptr. 809, 453 P.2d 353].) All of the cases cited by the *Velasquez* majority are examples of the operation of this principle. *Witherspoon* substantially changed the law. (*In re Anderson* (1968) 69 Cal.2d 613, 618-619 [73 Cal.Rptr. 21, 447 P.2d 117].) All of the cases cited by the *Velasquez* majority were tried prior to *Witherspoon.* Therefore, failure to raise a *Witherspoon* objection at trial was excused on appeal in these cases, expressly or impliedly, on this ground. The relevant portion of the *Velasquez* majority opinion follows.

"Shortly after *Witherspoon*, the United States Supreme Court reversed and remanded two cases in which the *Witherspoon* error was raised neither at trial nor on appeal. (*Maxwell* v. *Bishop* (1970) 398 U.S. 262 [26 L.Ed.2d 221, 90 S.Ct. 1578]; *Boulden* v. *Holman* (1969) 394 U.S. 478 [22 L.Ed.2d 433, 89 S.Ct. 1138].) The court then granted certiorari in *State* v. *Wigglesworth* (1969) 18 Ohio St.2d 171 [47 Ohio Ops.2d 388, 248 N.E.2d 607], in which the Ohio Supreme Court had held the defendant waived *Witherspoon* error (see 248 N.E.2d at pp. 613-614), and reversed *per curiam*, citing *Witherspoon, Maxwell* v. *Bishop, supra*, and *Boulden* v. *Holman, supra.* (*Wigglesworth* v. *Ohio* (1971) 403 U.S. 947 [29 L.Ed.2d 857, 91 S.Ct. 2284].) *Harris* v. *Texas* (1971) 403 U.S. 947 [29 L.Ed.2d 859, 91 S.Ct. 2291], also summarily reversed a lower court decision holding that failure to object waived *Witherspoon* error. [¶] The California decisions similarly reject waiver of *Witherspoon* error. (See *People* v. *Risenhoover, supra*, 70 Cal.2d 39, 56 [73 Cal.Rptr. 533, 447 P.2d 925]; *In re Anderson* (1968) 69 Cal.2d 613, 618-619 [73 Cal.Rptr. 21, 447 P.2d 117].)" (26 Cal.3d at p. 443.)

First, the California cases cited will be examined. In *In re Anderson, supra*, the defendants' failure to raise a *Witherspoon* objection below was excused on the following ground: "It is obvious that *Witherspoon*

---

[2]I joined Justice Richardson in dissenting in *Velasquez* on the ground there was no *Witherspoon* error. Therefore, I did not find it necessary to reach the waiver question in that case.

made a material change in the law in this state. Since petitioners were tried before *Witherspoon*, failure to object to the exclusion of the prospective jurors in question does not bar petitioners from now claiming error." (69 Cal.2d at p. 619.) In *People v. Risenhoover, supra*, because the trial also obviously occurred prior to *Witherspoon*, failure to object in the trial court to the exclusion of prospective jurors was excused in reliance on *Anderson*. (70 Cal.2d at pp. 55-56.) Examination of the United States Supreme Court cases cited reveals that they, too, were all tried prior to *Witherspoon*. (*Maxwell v. Bishop, supra*, 398 U.S. 262, 264 [26 L.Ed.2d 221, 223]; *Boulden v. Holman, supra*, 394 U.S. 478, 484, fn. 8 [22 L.Ed.2d 433, 439]; *State v. Wigglesworth, supra*, 18 Ohio St.2d 171, 173; *Harris v. State* (Tex.Crim. 1970) 457 S.W.2d 903, 908.)

Significantly, the *Velasquez* majority did not mention the cases which have held that *Witherspoon* error *is* waived by failure to object. (*Boulware v. State* (Tex.Crim. 1976) 542 S.W.2d 677, 682-683, cert. den., 430 U.S. 959 [51 L.Ed.2d 811, 97 S.Ct. 1610]; *Shippy v. State* (Tex.Crim. 1977) 556 S.W.2d 246, 251, cert. den., 434 U.S. 935 [54 L.Ed.2d 294, 98 S.Ct. 422]; *Von Byrd v. State* (Tex.Crim. 1978) 569 S.W.2d 883, 891, cert. den., 441 U.S. 967 [60 L.Ed.2d 1073, 99 S.Ct. 2418]; *Clark v. State* (1978) 264 Ark. 630 [573 S.W.2d 622, 625-626].)

In *People v. Rogers* (1978) 21 Cal.3d 542, 548 [146 Cal.Rptr. 732, 579 P.2d 1048], we reiterated "the general rule that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal. [Citations.] The contrary rule would deprive the People of the opportunity to cure the defect at trial and would 'permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed on appeal.' (*Coy v. Superior Court* (1959) 51 Cal.2d 471, 473 [334 P.2d 569].) For the same reason a *Miranda* issue, for example, may not be raised for the first time on appeal. [Citations.]"

Analogously, a *Witherspoon* contention should not be reviewed on appeal in the absence of objection below. The contrary rule encourages defense counsel to "sandbag" the trial judge. For example, this judge expressly invited defense counsel to further question prospective jurors before they were excused. Had counsel availed himself of this opportunity, the error of which he now complains might have been prevented.

But counsel remained silent. Indeed, silence is golden in these circumstances, for counsel cannot lose by it. Either his client is acquitted or sentenced to life imprisonment, or the death penalty is reversed on appeal for *Witherspoon* error.

In the urgency clause of the 1977 death penalty statute, the Legislature stated: "The California Supreme Court has declared the existing death penalty law unconstitutional. This act remedies the constitutional infirmities found to be in existing law, and must take effect immediately in order to guarantee the public the protection inherent in an operative death penalty law." (Stats. 1977, ch. 316, § 26.) In reality, the public still does not have the protection inherent in an operative death penalty law. Three years later, this court has yet to uphold a single death penalty judgment.

Thus far, four cases arising under the 1977 statute have been reviewed; in all four the death penalty has been reversed. (*People* v. *Teron* (1979) 23 Cal.3d 103 [151 Cal.Rptr. 633, 588 P.2d 773]; *People* v. *Frierson* (1979) 25 Cal.3d 142 [158 Cal.Rptr. 281, 599 P.2d 587]; *People* v. *Velasquez, supra*; and the present case.) In two of those four cases—*Velasquez* and this case—the reversals were predicated on *Witherspoon* error despite failure to object on that ground at trial. It is therefore probable that *Witherspoon* error will now be claimed in virtually every one of the some 30 death penalty cases presently pending before us. I reluctantly conclude that it is also probable the will of the People will continue to be thwarted.

The judgment convicting defendant of first degree murder and imposing the penalty of death should be affirmed.

The petitions of both parties for a rehearing were denied May 14, 1980. Clark, J., was of the opinion that the petitions should be granted.