Filed 5/12/21  P. v. Diaz CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ROCKY ROBERT DIAZ,<br><br>    Defendant and Appellant. | H046244<br>(Santa Clara County<br>Super. Ct. No. C1488622) |

Defendant Rocky Robert Diaz was convicted by a jury of three counts of forcible lewd conduct (Pen. Code, § 288, subd. (b)(1))[1] and one count of nonforcible lewd conduct (§ 288, subd. (a)), and the trial court sentenced him to 12 years in prison. On appeal, he contends that (1) the forcible lewd conduct counts were not supported by substantial evidence of force, (2) his trial counsel was prejudicially deficient in failing to object to testimony by a prosecution expert about the rate of false allegations of molestation by children, (3) the trial court prejudicially erred in admitting evidence of prior uncharged molestations under Evidence Code section 1108 that had occurred when defendant was 10 to 13 years old because there was no foundational showing that his conduct at that age supported a propensity finding and insufficient evidence that he knew that his conduct was wrongful, (4) the trial court prejudicially abused its discretion in admitting the priors under Evidence Code section 1101, subdivision (b), (5) the trial court abused its discretion under Evidence Code section 352 in admitting the priors, (6) the

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

instructions on the priors were prejudicially improper, and (7) the alleged errors were cumulatively prejudicial.[2] We find insufficient evidence of force to support one of the section 288, subdivision (b) counts and modify the judgment to reduce that count to a violation of section 288, subdivision (a). We reject the remainder of defendant's contentions and affirm the modified judgment.

## I.     THE PROSECUTION'S CASE

Amber was born in 1997. Her family is "huge," and she has more than 50 cousins. Defendant is Amber's first cousin and godfather. Defendant was "like a son" to Amber's mother, and defendant's daughter, Sara, was Amber's close friend. Amber and Sara often had "sleepovers" at defendant's home. When Amber had a sleepover at defendant's home with Sara, her parents told her to "listen to" defendant.

One evening in 2007 or 2008 when 10 or 11-year-old Amber was at a sleepover at defendant's home, defendant called her into his bedroom and locked the door. The window of defendant's bedroom was covered with a blanket. He took a pair of "thong" underwear out of a drawer and told her to "try them on." She told him to turn around, and he turned around while she put them on. Amber took her pants and underwear off and put on the thong underwear. Defendant turned back around and looked at her, and then she put back on her own clothes.

The next thing that happened was that defendant "pulled [her] onto the bed" on top of him. He lifted up her shirt and kissed, licked, and sucked on her nipples. While he was doing this, Amber struggled with him and tried to push him away from her. Defendant pushed her onto the bed on her back with the full weight of his body on top of her and his arms on her arms.[3] He began "grinding" his "private parts" into her "private

---

[2] Defendant has also filed a habeas petition, which we dispose of by separate order.

[3] Defendant testified that he weighed 275 pounds in 2008.

2

parts" through their clothing. At some point during this incident, defendant kissed her on the neck with a "peck."[4] Amber was scared and, though she said "stop," defendant did not stop. The very brief incident ended when Sara called out to Amber. At that point, defendant, who was on top of her, let her go.

A separate incident occurred at Amber's home when defendant was there fixing a computer in the computer room. When Amber entered the room, defendant gave her a hug and pulled her on top of him in a chair. He lifted up her shirt and started kissing, licking, and sucking her breasts. Defendant also moved her body "making me grind on him." She told him to stop, but he did not stop. She tried to pull her shirt back down, but he pushed her hands aside. Amber's father called out to her, and defendant pushed her off of him. She pulled down her shirt and ran away. The incident lasted "a few minutes."

Amber did not tell anyone about the molestations when they happened because she "was scared to tear apart the family." In July 2012, Amber told her sister about defendant's actions. Her sister told her to tell her father, and she did so right away. The following day she told her mother. Soon after that, Amber told her first cousin, Sabrina, and the police. Sabrina revealed to Amber that she too had been molested by defendant. Sabrina had learned from other family members that defendant had molested Amber, and she blamed herself because she had not come forward earlier. After talking to Amber, Sabrina told the police what defendant had done to her.

Amber's mother confronted defendant and asked him why he had molested Amber. Defendant denied it at first and then said " 'I was trying to help her dress and change into this' " underwear. Amber's biological father also confronted defendant.

---

[4] At trial, Amber could not remember some of the details even after looking at her testimony from the preliminary examination. She explained that "once I talked [to the police], I tried to erase the memory as much as I could. So that's why I don't remember . . . ."

Defendant told him that "they were messing around, and he brushed up against her, and that she misunderstood it."

Sabrina, who is also defendant's first cousin, is six years younger than him. When Sabrina was little, she spent a lot of time at her grandmother's house, and defendant lived across the street. One night, four-year old Sabrina was asleep in a bedroom of her grandmother's house when defendant awakened her in the middle of the night and said " 'Let's go watch TV.' " He took her to a spot under a table in the living room where, as they were watching television, he touched her buttocks inside her pajamas. On another occasion, Sabrina and defendant were in the garage of their grandmother's house, behind a bar area, and defendant tried to pull down Sabrina's pants. Before he could succeed, they heard someone nearby, and he stopped and left the garage. On a separate occasion in the garage, defendant put his penis on Sabrina's vagina. When Sabrina was about seven years old, another incident happened in the garage. Sabrina and defendant were playing pool on the pool table when he tried to pull her pants down. She held her pants up and said " 'no.' " At that point, their uncle Paul came into the garage and saw defendant "on his knees with his hands around her." Sabrina was standing, and defendant's face was next to Sabrina's crotch. His hands were on her hips or buttocks. Paul told Sabrina to go into the house, and he came into the house and "told them what happened and said he ran off." Paul told Sabrina's parents and defendant's parents about what he had seen.

Sabrina confronted defendant at a family gathering in 2009 and told him that she remembered "everything that he did." She said: " 'I could say everything you did to me.' " Defendant had no reaction. Amber's mother witnessed that confrontation, and she recalled that Sabrina had accused defendant of raping her when she was five years old. Defendant did not deny Sabrina's accusation during that confrontation. Amber's mother recalled that she had heard from defendant's mother, many years earlier, that

4

defendant had "pulled [Sabrina's] pants down." She had not understood at that time that this was an act of sexual misconduct.

A clinical psychologist testified for the prosecution about child sexual abuse accommodation syndrome (CSAAS) in order to educate the jury about behaviors by children that were not inconsistent with a child having been a victim of sexual abuse.

## II. THE DEFENSE CASE

Defendant testified on his own behalf. He was born in 1974, and he lived across the street from his grandmother from 1980 to 1986. He denied molesting Amber. Although he admitted that Amber had been at his home for sleepovers, he denied that any of sleepovers were in 2008 or 2009. He insisted that her last sleepover at his home was in late 2007 and that he had never called her into his bedroom on the evening of a sleepover. Defendant testified that he had once given 10-year-old Amber a pair of underwear to put on because she did not have a clean pair, but he testified that she was in the bathroom and he was outside the bathroom when he handed her the underwear. He did not see her put them on. She told him that the underwear did not fit. Defendant denied that Amber had ever been on a bed with him. He testified that he had once given Amber a shirt to put on because she was wearing a skimpy top that he thought was too revealing, and she had taken off the skimpy top and put on the shirt. That was the only time he had ever seen her chest exposed. Defendant testified that Amber sometimes would jump on his lap or his back.

Defendant admitted that there had been an "incident where my uncle Paul walked in on me and my cousin, Sabrina." He denied ever having touched Sabrina inside her clothes, and he denied having tried to pull down her pants. He also denied putting his penis on her vagina. However, he conceded that he "was told" that he had attempted to pull down Sabrina's pants on the occasion when Paul walked in. Although defendant claimed not to remember the incident, he testified that that day he was 12 years old and "intoxicated" because he had been drinking beer and "[p]robably smoked marijuana"

5

also. He testified "I don't know" when asked if he "intended to sexually arouse yourself or Sabrina that day," but he also denied that he had ever had any such intent. Defendant denied that he had ever touched Sabrina "in a way that would be sexually abusive." Defendant testified that five years after that incident he stopped drinking and taking drugs and had maintained his sobriety ever since. He denied making the statements that Amber's mother and biological father had testified he made when they confronted him.

On cross-examination, defendant adamantly denied having touched Sabrina when she was four years old but said he did not remember whether he had done so when she was eight years old. The prosecutor questioned why he could remember all of the circumstances other than whether he touched Sabrina on that occasion. Defendant testified "[m]aybe I wasn't molesting my cousin." He ultimately claimed that he could not remember the incident with Sabrina because he had been drinking and smoking marijuana.

Defendant's son, daughter, and stepdaughter testified that Amber was not a truthful person, that defendant was a truthful person, that defendant did not have a propensity to molest children, and that they had never seen defendant act inappropriately with any female. Defendant's daughter, Sara, testified that she had never seen defendant act inappropriately with Amber and that Amber had never told Sara that he had.

## III.   PROCEDURAL BACKGROUND

Defendant was charged by information with six counts of forcible lewd conduct. The jury returned a not guilty verdict on the sleepover count associated with the underwear but found defendant guilty of the lesser included offense of nonforcible lewd conduct for that count.[5] It returned guilty verdicts on the three other sleepover counts (the neck kiss count, the nipples count, and the grinding count). The jury deadlocked on

---

[5] The prosecutor had conceded in argument to the jury that there was no force involved in the underwear count. He argued that it "involve[d], potentially duress or fear."

6

the computer room counts, and the court declared a mistrial on those counts. The court imposed a six-year term for the nonforcible count, a consecutive six-year term for the grinding count, and concurrent six-year terms for the other two counts. Defendant timely filed a notice of appeal.

## IV. DISCUSSION

### A. Substantial Evidence

Defendant challenges the sufficiency of the evidence to support the force element of the three forcible lewd conduct counts: count 2 (kissing Amber's nipples), count 3 (kissing her neck), and count 4 (grinding his genitals against hers).

" 'A defendant uses "force" if the prohibited act is facilitated by the defendant's use of physical violence, compulsion or constraint against the victim other than, or in addition to, the physical contact which is inherent in the prohibited act.' (*People v. Bolander* (1994) 23 Cal.App.4th 155, 164 (conc. opn. of Mihara, J.).) 'The evidentiary key to whether an act was forcible is not whether the distinction between the "force" used to accomplish the prohibited act and the physical contact inherent in that act can be termed "substantial." Instead, an act is forcible if force facilitated the act rather than being merely incidental to the act.' (*Id*. at pp. 164-165 (conc. opn. of Mihara, J.).) '[A]cts of grabbing, holding and restraining that occur in conjunction with the lewd acts themselves' are sufficient to support a finding that the lewd act was committed by means of force. (*People v. Alvarez* (2009) 178 Cal.App.4th 999, 1005.)" (*People v. Morales* (2018) 29 Cal.App.5th 471, 480; accord *People v. Garcia* (2016) 247 Cal.App.4th 1013, 1025.)

Defendant claims that counts 2 (nipples) and 4 (grinding) did not involve force because "the only restraint was that inherent in the 'missionary position,' " which he claims was "inherent in the lewd act itself." He argues that "[t]he fact of one person being on top of another is so typical of ordinary sexual acts that involve the pelvises of

7

each that it cannot reasonably be said that this was force above and beyond that inherent in the lewd act itself."

Defendant's argument disregards both the law and the facts. The evidence demonstrated that defendant pushed and pulled Amber onto the bed and overcame her struggles and attempts to push him away in order to accomplish counts 2 and 4. None of those acts was inherent in his kissing of Amber's nipples or his grinding of his genitals into hers. Count 2 did not in any respect "involve the pelvises" of defendant and Amber, so it was not inherent in that act that he have his entire weight upon her. Nor was it inherent in count 4 that defendant's entire weight be on top of Amber or that his arms be on her arms. Defendant's use of force on Amber was not merely incidental but instead was facilitative conduct that amounted to force.

Defendant's challenge to the force element of count 3, the neck kiss, has merit though. Amber could not even remember the neck kiss at trial, and the only evidence of the neck kiss—her preliminary examination testimony, which was admitted at trial—provided no context at all for that act other than that it had occurred during the sleepover incident in defendant's bedroom.

A trier of fact may rely on inferences to support a conviction only if those inferences are "of such substantiality that a reasonable trier of fact could determine beyond a reasonable doubt" that the inferred facts are true. (*People v. Raley* (1992) 2 Cal.4th 870, 891.) "A reasonable inference, however, 'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence.' " (*People v. Morris* (1988) 46 Cal.3d 1, 21, disapproved on a different point in *In re Sassounian* (1995) 9 Cal.4th 535, 543, fns. 5 & 6.)

Here, there was no evidentiary basis for a reasonable inference beyond a reasonable doubt that the neck kiss was facilitated by any of the force defendant utilized

8

to commit counts 2 and 4. No evidence reflected that the neck kissing occurred *after* defendant began using force by pulling Amber onto the bed. Consequently, the force element was lacking, and this count must be reduced to a conviction for nonforcible lewd conduct.

### B. Ineffective Assistance

Defendant claims that his trial counsel was prejudicially deficient in failing to object to and move to strike testimony by the prosecution's CSAAS expert about the rate of false sexual abuse allegations by children.

### 1. Background

Defendant brought an in limine motion seeking exclusion or limitation of CSAAS evidence and also requested a limiting instruction if such evidence were to be admitted. The prosecution sought admission of CSAAS evidence. The court ruled that CSAAS evidence was admissible but would be "limited to explaining why the victim's behavior is not inconsistent with [abuse]."

The prosecution's CSAAS expert, Blake Carmichael, was the final prosecution witness. At the commencement of Carmichael's testimony, the court told the jury: "Dr. Carmichael is going to be testifying regarding child sexual abuse accommodation syndrome. His testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any crimes charged against him. You may consider [it] in deciding whether or not Amber Doe's conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

Carmichael, a clinical psychologist, testified that he worked with sexually abused children. He described CSAAS as "an educational tool to educate people about what we know with regards to kids who have been sexually abused." Carmichael testified that he knew nothing about the facts of this case or the charges. He explained that CSAAS had been developed by Dr. Summit based on "documented cases of sexual abuse."

9

Carmichael described the five components of CSAAS, and he noted that "[t]here's no way to tell if a child has been abused by using a test. That's why we have a legal process, and that's up to the jury."

On cross-examination, defendant's trial counsel elicited Carmichael's testimony that CSAAS was not really a syndrome but a "pattern." He also adduced Carmichael's testimony that Summit's research had been based on children who were "known" victims of sexual abuse. Carmichael testified: "CSAAS only applies to kids who they know were sexually abused." He explained that the studies of CSAAS were limited to "confirmed cases of sexual abuse." Defendant's trial counsel then asked Carmichael if he was "aware of any study regarding the way that children who have made false accusations of sexual abuse might react or might conduct themselves." Carmichael responded: "So I'm aware of—well, aware of the research on false allegations. The research says that false allegations made by children are quite rare and that there are two separate populations of kids where kids who have been abused, you can study how they act and those kinds of things. [¶] False allegations have been studied a great deal, like I said, and most of those false allegations came from parents in custody disputes. So it's really defining the kind of the context within false allegations occur and, again, with kids making false allegations. It's quite rare." Defendant's trial counsel did not object to Carmichael's testimony that "false allegations made by children are quite rare."

Defendant's trial counsel persisted in addressing this topic and basically repeated his question: "Is there a study which differentiates the way that a child who has truly been abused might react or conduct themselves with respect to these five categories, as opposed to the way a child who might have made a false allegation might conduct themselves." Carmichael responded that there was no "way to tell if that kid was abused or not by the way they act or say things . . . ." "There's no test you can do. There's no interview you can do to make it a solid finding they were abused. That's why we have juries." "I don't decide if the child has been abused or not."

10

Subsequently, in responding to questions by defendant's trial counsel about retraction, Carmichael volunteered "[a]gain, false allegations are quite rare—exceedingly rare for kids." Defendant's trial counsel did not object to this volunteered response. He later asked Carmichael if he could "identify any type of conduct you would say is not—that would not be considered consistent with having been sexually abused." Carmichael responded that this was "an almost impossible question to answer."

Defendant's trial counsel proceeded to directly query Carmichael about his testimony about the rarity of "false claims." "Q. You mentioned that false claims—known, false claims are fairly unusual—'pretty rare' is the term I think you used. [¶] A. Yeah, anywhere from zero to four or six percent of what the researchers are saying are false allegations. Even within that, you have studies that find that those percentages are initiated by the parents or non-custodial parents in custody disputes. And there were no false claims by kids in those studies. Again, it's rare for kids to have false claims of being sexually abused, according to the research we have now. [¶] Q. But that's based on your being able to identify a claim as being false; correct? [¶] A. Right." After Carmichael referred vaguely to "research . . . finding that percentage," defendant's trial counsel asked: "But we don't have any idea how many kids may have made false claims of being sexually abused . . . [where] that claim never got reported to authorities." Carmichael responded that "the percentages that I cited are more oftentimes kids telling a family member, and that getting to authorities . . . ."

On redirect, the prosecutor asked Carmichael about "false allegations." "[W]hen you were talking about false allegations with [defendant's trial counsel] just a moment ago I heard you say between zero, four and six. Was that 4.6 or between zero and six basically?" Carmichael responded: "So depending on the research article, those are saying between zero percent and six percent of kids are false allegations. However, the majority of those are on the lower end. Even though they are higher reports, it's typically the parents and not the kids making those reports."

11

After Carmichael had completed his testimony, outside the presence of the jury, the court noted that it had offered to give a further admonishment on the CSAAS evidence, but defendant's trial counsel had declined, which he confirmed. At the end of the trial, the court instructed the jury with CALCRIM No. 1193 on the limited purpose of CSAAS testimony. "You have heard testimony from Blake Carmichael regarding [CSAAS]. [¶] Mr. Carmichael's testimony about [CSAAS] is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not Amber Doe's conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

Defendant's trial counsel argued to the jury that the CSAAS testimony was "worthless." "[N]o matter what the girl says, their position is that's not inconsistent with having been abused. And I can't think of a more worthless expert expression than that."

The prosecutor addressed Carmichael's testimony near the end of his rebuttal argument and explicitly brought up Carmichael's testimony about the rarity of false allegations. "Dr. Carmichael mentioned that false reportings were exceedingly rare, and he raised a particular point I want to bring up, because I do think it applies in this situation. He said that based on the studies that had been done—he mentioned one in Colorado with 7,000 kids, and another one—I don't remember what state it was in. It was a thousand plus kids. The false report rate for this type of abuse was between zero and 6 percent, but that 6 percent number was more commonly associated with child custody cases, and those cases were situations where not a child said they were abused and it turned out to be false, but rather parent had accused another parent of an abuse that never happened for the purposes of a child custody case. Well, clearly, that's not what we're talking about. That doesn't apply to any of the facts we have. So now we're on the lower end of the scale for likelihood of false reports. Was anyone mad at anyone else before this happened? Was there any sort of family dispute that was happening that

12

would suggest that Amber was mad at really anyone? Rocky? Sara? [Defendant's son]? [Defendant's stepdaughter]? Was anyone on Rocky's side of the family mad at [Amber's mother]? Or [Amber's father]? Or Amber? No. It's not just that there isn't any evidence of that. It's that the answer is literally 'no,' because I asked every single one of the defense witnesses that testified. So if no one was mad at anybody else, and there's no custody dispute or family squabble that's happened or something like this . . . ."

During deliberations, the jury asked for and received a reread of Amber's testimony.

### 2.     *Analysis*

Defendant contends that his trial counsel was prejudicially deficient in failing to object to Carmichael's testimony that it was "rare" for a child to make a false allegation and that the rate of false allegations was less than 6 percent. He contends that the failure to object cannot be presumed to be a reasonable strategic choice because "[t]here was nothing that could possibly be gained by failing to object." "There is no conceivable reason why an attorney defending a client in a trial of charges of child molest could want the jury to hear that it is rare for children to falsely make such charges." He argues that the deficiency was prejudicial because (1) the objectionable testimony was not brief but repeated, (2) the prosecutor emphasized this testimony in rebuttal argument to the jury, (3) the case was a credibility contest that hinged on the truth of Amber's testimony, (4) the jury requested a readback of Amber's testimony, (5) the jury did not convict defendant of the computer room counts despite Amber's testimony that those events occurred, (6) Amber's sister may have suggested "details" to Amber, and (7) Amber repeatedly had difficulty recalling the events.

The Attorney General argues that defendant's trial counsel must be presumed to have made a tactical decision not to object and move to strike: "[Defendant's trial counsel] could reasonably have thought that he would have to broach the subject of the content of the studies of false allegations, and therefore there was no point to moving to

strike the answer as non-responsive, only to have it come out later. An objectively competent attorney in that position could reasonably have thought that moving to strike an answer that was unfavorable, but that the jury might conclude was a reasonable response to his question, could be harmful to the defense." The Attorney General also argues that defendant's trial counsel's failure to object and move to strike was not prejudicial because (1) the jury had the opportunity to assess Amber's credibility, (2) "Carmichael did not directly vouch for Amber's account," and (3) the jury did not convict defendant on the computer room counts, demonstrating that it was not relying on the statistical evidence.

"To succeed on an appellate claim of ineffective assistance, a defendant must establish that his trial counsel's performance was deficient and that his defense was prejudiced by the deficiency. [Citations.] 'The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' [Citation.] Whenever counsel's conduct can be reasonably attributed to sound strategy, a reviewing court will presume that the conduct was the result of a competent tactical decision, and the defendant must overcome that presumption to establish ineffective assistance. [Citation.]" (*People v. Fromuth* (2016) 2 Cal.App.5th 91, 113.)

"[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502.) "[C]ompetent counsel may often choose to forgo even a valid objection. '[I]n the heat of a trial, defense counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings. The choice of when to object is inherently a matter of trial tactics not ordinarily reviewable on appeal.' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1197.) "[U]nless there simply could be no satisfactory explanation," a claim of ineffective assistance cannot succeed on appeal but may be "more appropriately made" in a habeas corpus proceeding where "there is an opportunity in an evidentiary hearing to

14

have trial counsel fully describe his or her reasons for acting or failing to act in the manner complained of." (*People v. Pope* (1979) 23 Cal.3d 412, 426.)  To succeed on appeal, a defendant must establish that "there could be no satisfactory tactical reason for not making a potentially meritorious objection."  (*People v. Nation* (1980) 26 Cal.3d 169, 179.)  " '[T]he defendant must affirmatively show that the omissions of defense counsel involved a critical issue, and that the omissions cannot be explained on the basis of any knowledgeable choice of tactics.' " (*People v. Lanphear* (1980) 26 Cal.3d 814, 828-829.)

The trial in this case took place in March 2018.  A year later, the First Appellate District, Division Four held in *People v. Wilson* (2019) 33 Cal.App.5th 559 (*Wilson*) that a trial court erred in admitting testimony by a prosecution CSAAS expert on the rate of false allegations.  In *Wilson*, both the prosecution's expert and the defense expert testified at trial about false allegations.  (*Id.* at pp. 566-567.)  On direct examination by the prosecutor, the prosecution's CSAAS expert testified that false allegations occurred " 'very infrequently or rarely' most often during a child custody dispute."  (*Id.* at p. 568.)  He mentioned a study that had found a four percent rate of false allegations, and he testified that " 'in none of those cases was it a child who made the allegation that was false, it was somebody else,' such as a parent disputing custody."  (*Ibid.*)  On cross-examination, he acknowledged that it was difficult to determine whether an allegation was false, but he also mentioned that there were "12 to 15 other studies on the subject, which found false allegations in between 1 and 6 percent of cases."  (*Ibid.*)  He repeated his assertion that false allegations "happen very infrequently and rarely."  (*Ibid.*)  However, he also conceded that he had personally encountered two cases where "a child alleged sexual abuse that he believed did not occur."  (*Ibid.*)

The First Appellate District acknowledged that there was no California authority on this issue, but it cited a host of cases from other jurisdictions that had held such evidence inadmissible because it invaded the jury's province.  (*Wilson*, *supra*, 33

15

Cal.App.5th at pp. 568-570.) "Thus, it appears that the clear weight of authority in our sister states, the federal courts, and the military courts finds such evidence inadmissible." (*Id.* at p. 570.) The First Appellate District concluded that the evidence was inadmissible because it "suggest[ed] to the jury that there was an overwhelming likelihood [the victim's] testimony was truthful," which "invaded the province of the jury, whose responsibility it is to 'draw the ultimate inferences from the evidence.'" (*Ibid.*) The testimony was also irrelevant and more prejudicial than probative. (*Id.* at p. 571.) Because the admission of the testimony was an ordinary evidentiary error, the First Appellate District reviewed it for prejudice under the state law harmless error standard of review. (*Id.* at pp. 571-572.) It found the objectionable testimony harmless because it was brief, the expert acknowledged that it was difficult to determine whether an allegation was false and that he had personally encountered false allegations, and the defense expert testified that there was no way to know the actual ratio of false allegations, though he acknowledged that it was rare for a child to purposefully make a false allegation. (*Id.* at p. 572.)

A month after *Wilson*, the Second Appellate District, Division Six decided *People v. Julian* (2019) 34 Cal.App.5th 878 (*Julian*), which also dealt with expert testimony about the rate of false sexual molestation allegations by children. The CSAAS expert in *Julian* testified on direct examination that "false allegations by children 'don't happen very often,'" and that the "'range of false allegations'" was "'as low as one percent of cases to a high of maybe 6, 7, 8 percent of cases . . . .'" He also testified that false allegations were "'very infrequent, or rare'" and that most of the false allegations in one study, which showed 4 percent false allegations, were in custody dispute situations. *Julian*'s trial counsel did not object to this testimony. (*Id.* at p. 883, italics omitted.) On cross, *Julian*'s trial counsel asked the expert about the studies that had concluded that there was a "'range from one to seven to eight percent'" false allegations. The expert testified that false allegations were "rare and 'very' infrequent" and asserted that

16

12 studies supported a false allegation rate of one to eight percent. (*Ibid.*) Julian's trial counsel then examined the expert about the various studies, adducing additional testimony by the expert about the low rate of false allegations. On redirect, the prosecutor asked the expert about an article that found no false allegations where the child was the source of the information. (*Id.* at pp. 883-884.)

The Second Appellate District held that the expert's testimony improperly "invited jurors to presume Julian was guilty based on statistical probabilities" rather than the evidence and thereby "deprived Julian of his right to a fair trial." (*Julian*, *supra*, 34 Cal.App.5th at p. 886.) The court held that Julian's trial counsel's failure to object to the expert's testimony was deficient, but it did not significantly analyze the deficiency issue: "Here there is no justification for counsel's failure to object to [the expert]'s statistical evidence on false allegations. It was inadmissible and it improperly suggested Julian was guilty based on statistical probabilities that were irrelevant to this case." (*Id.* at p. 888.) The Second Appellate District found the deficiency prejudicial because "this case was a credibility dispute," and "[i]t was a heavily contested case with strong defense evidence." (*Ibid*.)

We wholeheartedly agree with the First and Second Appellate Districts that expert testimony on the rate of false allegations is improper and inadmissible. Since there was no objection to the testimony in this case, defendant forfeited any claim that the trial court erred in admitting and failing to strike the evidence. Defendant does not claim otherwise. He claims only that his trial counsel was prejudicially deficient in failing to object. The Attorney General insists that this claim cannot succeed on appeal because we must presume that the failure to object was a reasonable strategic choice, which would require defendant to proceed on this issue in his separately filed habeas corpus petition, rather than in this appeal. We elect to address this issue in this appeal because we conclude that, in this case, defendant's trial counsel's failure to object was not prejudicial.

17

"[T]he defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." (*Id.* at p. 694.) Nevertheless, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid.*)

Defendant's prejudice argument focuses on the fact that the prosecution's case hinged on the credibility of Amber's testimony and the objectionable testimony was repeated and was highlighted by the prosecutor in his argument to the jury.

It is true that Carmichael repeatedly testified on cross-examination that "according to the research" false allegations were "quite rare" or "exceedingly rare" and that "most" false allegations were made by parents in "custody disputes." He also testified: "[T]here were no false claims by kids in those studies." However, he further explained that studies had shown up to six percent of sexual abuse claims were false. And while Carmichael mentioned one study with "7,000" kids, he admitted that the other studies were much smaller, with sample sizes as low as 80 children. Carmichael also admitted that the research on false allegations was hampered by the fact that it could be difficult to identify whether a claim was false: "There is no test that you can do to say a kid was abused or not abused." On redirect, Carmichael briefly reiterated the up-to-6-percent figure. The prosecutor's rebuttal argument also repeated the up-to-6-percent figure and argued that the "6 percent number was more commonly associated with child custody cases . . . [which] doesn't apply to any of the facts we have . . . [s]o now we're on the

18

lower end of the scale for likelihood of false reports." He used this as support for his argument that Amber had no reason to falsely accuse defendant.

While we agree that the testimony and argument about the rate of false allegations was improper and irrelevant, we do not find that our confidence in the jury's verdict is shaken by the jury's exposure to it. The fact that the jury requested a readback of Amber's testimony suggests that the jury was properly focusing its attention on her credibility rather than on the irrelevant testimony and argument about the rate of false allegations. Nor does the jury's deadlock on the computer room counts reflect that the jury relied on the improper testimony and argument. The jury's deadlock on the computer room counts appears most likely to have hinged on concerns about the level of force used rather than on doubts about Amber's credibility. Furthermore, the deadlock also suggests that the improper testimony and argument did not cause the jury to blindly accept all of Amber's allegations. We do not see how Amber's admitted lack of recall and her sister's assistance in helping her to convey the details in any way suggest that the improper testimony and argument played any role in the jury's determinations. Those circumstances only highlight why the jury may have needed a readback of Amber's testimony to determine her credibility.

We also consider important the fact that Carmichael's improper testimony was accompanied by his repeated statements that the determination of whether a child had been abused was *up to the jury*. "There's no way to tell if a child has been abused by using a test. That's why we have a legal process, and that's up to the jury." "There's no test you can do. There's no interview you can do to make it a solid finding they were abused. That's why we have juries." "I don't decide if the child has been abused or not." The trial court reiterated the importance of the jury's role in its instructions to the jury: "You alone must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate, use your common sense and experience."

19

Under the circumstances of this case, the admission of the improper testimony and argument about the rate of false allegations does not undermine our confidence that the jury's verdicts were properly based on Amber's credibility. We can find nothing in the record to support defendant's claim that the jury was influenced by this irrelevant information. Consequently, we reject defendant's claim that his trial counsel was prejudicially deficient in failing to object and move to strike the improper testimony and argument.

### C.      Prior Conduct

Defendant contends that the trial court prejudicially erred in admitting evidence of his prior sexual abuse of Sabrina.

#### 1.      Background

The parties took opposing positions on the admissibility of evidence of the prior uncharged offenses. Defendant initially argued that this evidence should be excluded under Evidence Code section 352 because it was too remote, and the in limine hearing on this issue initially focused on remoteness. However, the prosecutor brought to the court's attention *People v. Cottone* (2013) 57 Cal.4th 269 (*Cottone*), which requires the prosecution to establish by clear and convincing evidence that the defendant was aware of the wrongfulness of his conduct when he engaged in the prior conduct if the defendant was under the age of 14 at the time of the prior conduct. The court then held an evidentiary hearing to determine whether the prosecution could make such a showing.

Sabrina testified at the evidentiary hearing that defendant had molested her six or seven times. During several of these incidents, Sabrina told defendant to stop. He never tried to touch her when anyone else was around. All but one of the incidents occurred in approximately 1985, when she was four years old and defendant was 10 or 11 years old, and the final incident occurred a couple of years later.

One of the earlier incidents occurred "in the patio" of her grandmother's house, which was an enclosed area in the backyard. Defendant, her first cousin, who lived

20

across the street from Sabrina's grandmother, pulled down her pants and underwear and put his mouth on her vagina. She was "scared and I peed," which "agitated" defendant. He said " '[j]ust go,' " and she ran away and hid in the bathroom. "[A] couple of times" she awakened in the middle of the night to find defendant touching her buttocks. Another time, defendant woke her up at night, took her to the living room on the pretext that they were going to watch television, and brought her under a table where he touched her "butt" under her clothes.

Two other incidents occurred in the garage of her grandmother's house when she was four years old. One time, Sabrina had been playing outside when defendant "got me" and "pulled" her behind a large piece of furniture in the garage. He was "trying to do something to me," and had put his hand in her pants, when they heard an adult walking nearby. Defendant stopped and "took off." Another time, Sabrina was lying between the pool table and the wall in a hidden area and her pants had been pulled down. Defendant put his penis so that it touched her vagina.

The final incident occurred a couple of years later when she was in first grade and defendant was 12 or 13 years old. Defendant asked her to go play pool in the garage, and then he kneeled and "tried to pull my pants down and got aggressive." She said no and "froze." Her uncle Paul came in and "stopped it." Defendant then "ran off."

The prosecutor argued that Sabrina's testimony established that defendant knew of the wrongfulness of his conduct because he chose secluded locations and ran away when other people showed up. The court found that the seven acts on Sabrina were "sexual crimes." It also concluded that defendant's actions showed that he knew of the wrongfulness of his conduct because he sought out Sabrina at night at a home where he did not live and took her to hidden spots before molesting her. The nature of the molestations became more and more "extensive." The court decided that, at least by the time of the television and garage incidents, defendant was aware of the wrongfulness of his conduct. The court excluded the patio incident and the two times when Sabrina was

21

in bed because it was not satisfied that defendant was aware at that point of the wrongfulness of his conduct.  It weighed the probative value against any potential prejudice and determined that the garage and TV incidents should be admitted under Evidence Code sections 1108 and 1101 (to show intent and absence of mistake).

### 2. *Foundation*

Defendant argues that evidence of his abuse of Sabrina was inadmissible because the prosecution failed to establish an adequate foundation that his abuse of Sabrina demonstrated that defendant had a predisposition to sexual offenses.  He argues: "[There] must be evidence that the defendant has a character that predisposes him to such offenses.  That a defendant, as an adult, has previously victimized children in this way provides a reason to believe both that the defendant has a sexual attraction to children and that the defendant has a readiness to act on that attraction.  This logic does not carry over to acts that children have engaged in with other children.  This is in part because a person's sexual attractions are not generally revealed and settled until after puberty.  It is also because a child's judgment as to when it is appropriate to explore sexuality with another person is not well developed."  "The suggestion that behavior that appellant engaged in as a child supports a similar inference does not provide that foundation.  Such a suggestion is contrary to the consensus opinion of the psychiatrists and psychologists who have studied such matters."  This contention was not raised below, and defendant fails to support it with any legal authority.  Instead, he cites only to the DSM-V's (Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition's) definition of a "pedophilic disorder."[6]

_____

[6] Defendant did not make a foundational challenge below, but the Attorney General does not clearly assert that he thereby forfeited an appellate foundation claim. The Attorney General asserts only that defendant forfeited any claim based on the DSM-V.  We elect to address the foundation claim that defendant makes despite the fact that it was arguable forfeited.

22

Defendant's claim runs aground on the California Supreme Court's analysis in *Cottone*, *supra*, 57 Cal.4th 269. In *Cottone*, the adult defendant was charged with sexually assaulting a young female relative. The trial court admitted evidence under Evidence Code section 1108 that defendant had touched the vaginal area of a young female relative when he was 13 years old. The issue on review was whether the court or the jury should decide whether the defendant knew of the wrongfulness of his prior conduct. The California Supreme Court held that this decision should be made by the court.

In the course of its analysis in *Cottone*, the court pointed out that "the proffer of this kind of evidence generally does not raise a relevance question" and that "[t]he [prior] conduct in this case, which involved touching the vaginal area of his young sister, was manifestly relevant on the question of whether defendant sexually assaulted another young female relative." (*Cottone*, *supra*, 57 Cal.4th at p. 286.) Instead, "the jury must decide whether that act demonstrates the defendant's propensity to commit the charged sexual offenses." (*Id.* at p. 288.) "[T]he defendant's youth may inform the jury's assessment of what the 1108 evidence proves. The circumstances of the conduct, including the defendant's age, may lead the jury to conclude that the evidence does little to demonstrate a propensity to commit the charged sex crime." (*Id.* at p. 290.) "Counsel remains free to argue that the evidence does not support the propensity inference. If the defense relies on the defendant's age to undermine the propensity conclusion, it may request a proper pinpoint instruction on that topic." (*Id.* at p. 294.)

The California Supreme Court's analysis in *Cottone* confirms that it is a *factual question* committed to the jury whether a prior sexual offense committed by a defendant when he was under the age of 14 shows a propensity to commit sexual offenses. This is true because the trial court's role in deciding whether evidence of a prior sexual offense is admissible under Evidence Code section 1108 is limited to performing an Evidence Code section 352 balancing. (Evid. Code, § 1108, subd. (a).) " 'In enacting Evidence

23

Code section 1108, *the Legislature decided* evidence of uncharged sexual offenses is so uniquely probative in sex crimes prosecutions it is presumed admissible . . . .' [Citation.] . . . 'It is enough the charged and uncharged offenses are sex offenses as defined in section 1108.' [Citation.]" (*People v. Loy* (2011) 52 Cal.4th 46, 63, italics added.) Since the Legislature has already decided that prior sexual acts are relevant to a defendant's predisposition to commit sexual acts, the prosecution was not required to present *foundational* evidence on this point.

Defendant's reliance on *People v. Jandres* (2014) 226 Cal.App.4th 340 (*Jandres*) and *People v. Earle* (2009) 172 Cal.App.4th 372 (*Earle*) is misplaced. *Jandres* concerned a prior incident, where defendant had put his finger in an 11-year-old girl's mouth, that was admitted under Evidence Code section 1108 in a case charging defendant with kidnapping and forcibly raping an 18-year-old adult. (*Jandres*, *supra*, at pp. 345-347.) *Earle* presented an issue concerning the joint trial of an indecent exposure case, in which defendant exposed himself while driving his car, with an assault with intent to commit rape case, in which defendant forced his way into a woman's car in a parking lot. (*Earle*, *supra*, at pp. 380-381.) Both of those cases concerned prior offenses that were highly dissimilar from the charged offenses, whereas here defendant's prior sex offenses were very similar to the charged offenses. Both the prior and current offenses were assaults on defendant's first cousins at locations in homes where the victims felt safe but where defendant, a trusted relative, was able to isolate and sexually touch them in secrecy. While similarity is not a required premise for admissibility under Evidence Code section 1108, here the fact that the prior and current offenses were similar strongly supported a relevance finding. We find no basis for defendant's foundational claim and reject it.

### 3. *Wrongfulness*

Defendant challenges the sufficiency of the evidence to support the trial court's finding that he knew the wrongfulness of his conduct when he abused Sabrina, which was a necessary predicate for the admission of the priors under Evidence Code section 1108.

Evidence Code section 1108 applies only to a "sexual offense" that is a "crime." (Evid. Code, § 1108, subd. (d)(1).) Under Penal Code section 26, there is a rebuttable presumption that a child under age 14 is incapable of committing a crime. (*Cottone*, *supra*, 57 Cal.4th at p. 280; § 26 (One).) To establish that an act of a child under 14 is a crime, the prosecution must show by clear and convincing evidence that the child knew of the wrongfulness of his or her conduct. (*Cottone*, *supra*, at pp. 280-281; § 26 (One).) Hence, evidence of a prior sexual act committed by a child under 14 is not admissible under Evidence Code section 1108 unless a showing is made by clear and convincing evidence that the child was aware of the wrongfulness of the act.[7] (*Cottone*, *supra*, at p. 281.) This determination is made by the trial court, not the jury. (*Id.* at p. 282.) A trial court's determination as to knowledge of wrongfulness may properly be based on "the attendant circumstances of the crime, such as its preparation, the particular method of its commission, and its concealment," and the child's " 'age, experience, knowledge, and conduct.' . . . ." (*In re Tony C.* (1978) 21 Cal.3d 888, 900.)

Here, there was clear and convincing evidence that defendant knew of the wrongfulness of his conduct when he touched Sabrina in the garage and the living room of Sabrina's grandmother's house. First, some of the initial incidents involved defendant waking Sabrina *in the middle of the night* even though he did not live in the house where she was sleeping. His surreptitious entry into her room at night strongly suggested that he understood that his activities with Sabrina needed to be undertaken in secret because

---

[7] No such showing was necessary for admission of the priors under Evidence Code section 1101, subdivision (b). (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1100.)

they were wrongful.  Second, defendant repeatedly took Sabrina to locations that were concealed, again strongly suggesting that he was aware that his activities with Sabrina were wrong.  Third, defendant repeatedly ignored Sabrina's requests that he stop molesting her, which further demonstrated that he was aware of the wrongfulness of his conduct.  Finally, when defendant heard someone approaching or was caught touching Sabrina, he fled, showing that he knew he was doing something wrong.

Defendant suggests that other possible inferences could be drawn from some of these circumstances, such as a desire for privacy, but, given the constellation of circumstances, the trial court could reasonably reject such possible inferences.  A rational factfinder could conclude by clear and convincing evidence that a boy who sneaks in at night, spirits a much younger girl to concealed locations, molests her, ignores her pleas to stop, and flees when an adult appears to be nearby knows what he is doing is wrong and is not merely seeking privacy.

### 4. *Evidence Code section 1101, subdivision (b)*

Defendant also contends that the priors were not admissible under Evidence Code section 1101, subdivision (b) because there were not non-propensity inferences that could be drawn from the priors as to the current charges.  Since the priors were properly admitted under Evidence Code section 1108 for propensity purposes, it is irrelevant whether they were also admissible under Evidence Code section 1101, subdivision (b).

### 5. *Evidence Code section 352*

Defendant contends that the trial court abused its discretion in failing to exclude the priors under Evidence Code section 352.

A trial court should consider five factors in exercising its discretion under Evidence Code section 352 to exclude prior sex offenses that are admissible under Evidence Code section 1108:  "(1) whether the propensity evidence has probative value, e.g., whether the uncharged conduct is similar enough to the charged behavior to tend to show the defendant did in fact commit the charged offense; (2) whether the propensity

evidence is stronger and more inflammatory than evidence of the defendant's charged acts; (3) whether the uncharged conduct is remote or stale; (4) whether the propensity evidence is likely to confuse or distract the jurors from their main inquiry, e.g., whether the jury might be tempted to punish the defendant for his uncharged, unpunished conduct; and (5) whether admission of the propensity evidence will require an undue consumption of time. [Citation.] A trial court balances this first factor, i.e., the propensity evidence's probative value, against the evidence's prejudicial and time-consuming effects, as measured by the second through fifth factors." (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1117.)

Defendant claims that all of these factors weighed against admission of the evidence so the trial court necessarily abused its discretion. He argues that the evidence had "vanishingly small" probative value, one of the prior acts was "more inflammatory" because it involving him placing his penis on Sabrina's vagina, and the prior acts were "remote" because they occurred 20 years before the charged offenses. He also contends that the fact that defendant was not punished for his acts on Sabrina meant that the jury was likely to be distracted. Finally, he asserts that evidence of the priors consumed considerable time at trial, which he deems "undue."

We agree with defendant that the priors were remote and that considerable time was spent at trial on evidence of the priors. However, we disagree with defendant's claim that the remoteness of the priors was disqualifying, and we reject his claim that the time devoted to them was undue. We also disagree with defendant regarding the remaining factors. The priors were quite similar to the current charges and therefore had considerable probative value. As we have already pointed out, the current and prior offenses all involved defendant opportunistically preying on his first cousins by isolating them in family homes where they felt safe. Since they had substantial probative value, the time devoted to them at trial was not undue. The incident where he placed his penis on Sabrina's vagina was not significantly more inflammatory than the charged "grinding"

27

offenses against Amber. The prior offenses were otherwise quite similar in character. Defendant also seems to have suffered some type of consequences within the family as a result of his offenses against Sabrina, so it seems highly unlikely that the jury would have been distracted by a perceived need to punish him for those offenses. The trial court could have reasonably concluded that the substantial probative value of the priors to show that defendant had a propensity for sexual offenses against his young female relatives was not "substantially outweighed" by "the probability" of prejudice from the remoteness of the priors. (Evid. Code, § 352.)

### 6. Instructions on Priors

Defendant claims that the trial court's instructions to the jury on the priors were prejudicially erroneous because they permitted the jury to use a preponderance of the evidence standard in determining whether he had committed the prior offenses.[8] However, he acknowledges that the California Supreme Court has upheld these instructions against such challenges (*People v. Virgil* (2011) 51 Cal.4th 1210, 1258) and that we lack the power to depart from the California Supreme Court's decision on this point (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455). Accordingly, we reject his claim.

### D. Cumulative Prejudice

Defendant claims that there was cumulative prejudice from multiple errors, but we have found only one nonprejudicial error so there is no prejudice to cumulate.

---

[8] The court gave CALCRIM No. 375, which concerns the use of the priors under Evidence Code section 1101, subdivision (b), and CALCRIM No. 1191A, which concerns the use of the priors under Evidence Code section 1108. Both of these instructions tell the jury that it "may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged offense or offenses." These instructions also tell the jury that "[t]he People must still prove each charge beyond a reasonable doubt." Defendant's trial counsel did not object to any of the instructions.

## V.    DISPOSITION

The judgment is ordered modified to reduce count 3 from a violation of section 288, subdivision (b)(1) to a violation of section 288, subdivision (a) due to the insufficiency of the evidence of force.  As modified, the judgment is affirmed.  The trial court shall prepare an amended abstract of judgment reflecting this modification and forward a certified copy to the Department of Corrections and Rehabilitation.

_____

ELIA, ACTING P.J.

WE CONCUR:

_____

BAMATTRE-MANOUKIAN, J.

_____

GROVER, J.

*People v. Rocky Diaz*
H046244